# United States Court of Appeals
## For the First Circuit

No. 12-2489

UNITED STATES OF AMERICA,

Appellee,

v.

SHAWN SAYER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Peter J. Cyr for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, was on brief, for
appellee.

May 2, 2014

**LYNCH, Chief Judge**.    This case challenges the constitutionality of the cyberstalking statute, 18 U.S.C. § 2261A. Shawn Sayer pled guilty to one count of cyberstalking and was sentenced to sixty months' imprisonment, the statutory maximum. Sayer appeals, on constitutional grounds, from the district court's denial of his motion to dismiss the cyberstalking charge in the indictment.  He also appeals from his sentence, arguing that he was eligible for a downward departure from a Guidelines sentence and so his sentence above the Guidelines range was unreasonable. We affirm.

I.

A.      Factual Background

The facts are not disputed on appeal.

Sayer and the victim in this case, Jane Doe,[1] had dated in Maine starting some time in 2004 until Jane Doe ended their relationship in January 2006.   After their break-up, Sayer persistently stalked and harassed Jane Doe for over four years.  At first, Sayer showed up at stores and other places where he knew that Jane Doe would be.  In response, Jane Doe changed her routine and gave up activities she loved for fear of seeing Sayer.  She also acquired a protection order against him in state court.

---

[1]    We refer to the victim in this case as "Jane Doe" to preserve her privacy.

Later, in the fall of 2008, Sayer started to use the internet to induce anonymous third parties to harass Jane Doe Specifically, several unknown men came to Jane Doe's house in Maine one day in October 2008 claiming that they had met her online and were seeking "sexual entertainment." Jane Doe was "shock[ed]" and "terrified" by these "dangerous"-looking men and decided to stay with a friend because she no longer felt safe in her home. She later discovered an online ad in the "casual encounters" section of Craigslist, a classified advertisements website, that had pictures of her in lingerie that Sayer had taken while they were dating. The ad gave detailed directions to her home and described a list of sexual acts she was supposedly willing to perform. Jane Doe did not place these ads nor did she authorize Sayer to place them.

The unwanted visits from men seeking sex persisted for eight months until June 2009, when Jane Doe changed her name and moved to her aunt's house in Louisiana to escape from Sayer and this harassment. Jane Doe began a new career and felt safe for a couple of months until August 25, 2009, when an unknown man showed up at her home in Louisiana and addressed her by her new name. Jane Doe said "the hairs on [her] arms stood up," as she had not told anyone except for a neighbor and her parents that she was moving. The man said he had met her online and was seeking a sexual encounter, having seen pictures of her on an adult pornography site. When Jane Doe later searched the internet, she

found videos of herself and Sayer engaged in consensual sexual acts from when they were dating on at least three pornography sites. Several of the websites included Jane Doe's name and then-current Louisiana address. One site encouraged viewers to write to Jane Doe and tell her what they thought of the videos.

Jane Doe contacted the police again in late September 2009 because someone had posted a fraudulent account in her name on Facebook, a social networking site, which included sexually explicit pictures of her. The false Facebook account was created on August 21, 2009 from 24 Marion Avenue in Biddeford, Maine, which had an unsecured wireless network; Sayer lived at 23 Marion Avenue. The police found videos of Jane Doe "engaged in sexually explicit activity" that had been posted to adult pornography sites on August 22, 25, and 29, 2009.

On November 5, 2009, the police searched Sayer's home pursuant to a warrant. They found two desktop computers that lacked hard drives and an empty laptop computer case. Sayer said that his computers had been hacked, so he had thrown out the hard drives. He also said he had thrown out his laptop after spilling water on it. The police did not believe him because they had seen "dozens of computer components scattered throughout his house."

The police seized a Nikon digital camera during this search. Although Sayer had said there were no pictures of Jane Doe on it, a forensic analysis of the camera uncovered a picture of

-4-

Jane Doe in a sexual position and another photo of her engaged in a sex act.

In December 2009, Jane Doe again contacted the police to report another fake profile that had been created under her name on MySpace, another social networking site. The profile had both her old and new names, her Louisiana address, and links to adult pornography sites hosting sex videos of Jane Doe.

The fake MySpace account was associated with multiple IP addresses from unsecured wireless networks in Saco, Maine, near where Sayer lived. A business with one of the unsecured networks had surveillance, which had captured an old green pickup truck resembling Sayer's green 1999 Ford truck parked outside for twenty minutes at about the same time that the fake MySpace account was being accessed. No one was seen getting into or out of the truck during the time that it was parked there.

Jane Doe returned to Maine the first week in November 2009 because the men that Sayer sent to her Louisiana home had scared her aunt and cousin, with whom she was staying. The cyberstalking charge in this case only encompasses Sayer's harassment of Jane Doe from "July 2009, the exact date being unknown, until about November 2009." However, Sayer continued to harass Jane Doe after she returned to Maine. As a result of new fraudulent accounts Sayer posted in Jane Doe's name soliciting sex from strangers, as many as six different men per night showed up at

her home in June 2010.  The police searched Sayer's home again on July 1, 2010.  Forensic analysis of a laptop computer they seized showed that Sayer had created "numerous fake profiles" through Yahoo! Messenger, an online chat service, using some variation of Jane Doe's name, between June and November 2009.  All of the profiles had sexually suggestive or explicit pictures of Jane Doe and in many cases directed viewers to sex videos of her on adult pornography sites.  In many instances, Sayer, posing as Jane Doe, chatted with men online and encouraged them to visit Jane Doe at her home in Louisiana.

Jane Doe said Sayer did not stop sending men to her home until he was arrested by state police in July 2010 for violating a protection order she had against him.[2]

---

[2]  For example, an ad that Sayer posted on Craigslist in January 2010 said Jane Doe was "looking for only five [guys] to gang bang me.  I will start hosting at 130 today.  First five that come get to join the fun. . . .  This will be fun.  I will do anything!!!!"  That ad included Jane Doe's name and current Maine address.

Sayer also created a new false Facebook profile in Jane Doe's name with links to videos of her having sex as late as June 2010. That profile said: "I'm always horny and entertaining.  I like to sit out back and drink so stop in to say hi.  If I am not out, knock on my back window.  I'll come out to play . . . . hehe. I just love to f**k."  In addition, two new MySpace profiles that Sayer had created in March 2010 gave directions to Jane Doe's home and invited both men and women to go there for sexual activity.

B.        Procedural History

        1.        Pre-Sentence Proceedings

        On July 13, 2011, Sayer was indicted with one count of cyberstalking, 18 U.S.C. § 2261A(2)(A), and one count of identity theft, 18 U.S.C. § 1028(a)(7).  As to the cyberstalking count, the indictment charged:

> From about July 2009, the exact date being unknown, until about November 2009, in the District of Maine, and elsewhere, Defendant, Shawn Sayer with the <u>intent to injure, harass, and cause substantial emotional distress</u> to a person in another state, namely, Louisiana, used facilities of interstate or foreign commerce, including electronic mail and internet websites, <u>to engage in a course of conduct that caused substantial emotional distress to the victim and placed her in reasonable fear of death or serious bodily injury.</u>

(emphasis added).

        Sayer initially pled not guilty to both counts on July 19, 2011.  On February 16, 2012, in a pre-trial motion to dismiss the cyberstalking count, Sayer made three constitutional arguments: (1) the cyberstalking statute is unconstitutional as applied to him because it imposes criminal sanctions on protected speech; (2) the statute is overbroad in violation of the First Amendment; and (3) the statute is unconstitutionally vague in violation of the Fifth Amendment.

        The cyberstalking statute provided:

        Whoever--

> (2) with the intent–

> > (A) to kill, injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate, or cause substantial emotional distress to a person in another State . . . uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that causes substantial emotional distress to that person or places that person in reasonable fear of . . . death . . . or serious bodily injury . . . shall be punished as provided in section 2261(b) of this title.

18 U.S.C. § 2261A(2)(A) (2006).[3]

The government opposed Sayer's motion on March 8, 2012, and the district court held a hearing on May 4, 2012. On May 15, 2012, the district court issued a memorandum and order denying Sayer's motion, ruling that § 2261A(2)(A) was neither unconstitutional as applied to Sayer nor facially invalid. United States v. Sayer, Nos. 2:11-CR-113-DBH, 2:11-CR-47-DBH, 2012 WL 1714746 (D. Me. May 15, 2012).

---

[3] After Sayer was convicted of one count of cyberstalking under § 2261A(2) and sentenced, the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 107(b), amended 18 U.S.C. § 2261A(2). The amended statute has no impact on this appeal, as it is not retroactive, and so the 2006 version of § 2261A applies to Sayer. See United States v. Goncalves, 642 F.3d 245, 252 (1st Cir. 2011) (explaining that defendants are liable under the statutes in effect at "the time of the conduct that makes the[m] liable"). The parties do not argue otherwise. As a result, we refer only to the 2006 version of § 2261A(2) in this opinion.

The court rejected Sayer's as-applied First Amendment challenge because "[n]one of th[e] activity [of which Sayer is accused] is speech protected by the First Amendment." Id. at *2. In addition, it reasoned that "everything that Sayer allegedly said was 'integral to criminal conduct,' his criminal conduct seeking to injure, harass or cause substantial emotional distress to the victim," and so not protected by the First Amendment under Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949). Id. at *2, *3.

As to Sayer's facial challenge, the district court held that § 2261A(2)(A) was not overbroad in violation of the First Amendment because Sayer had not shown that "a substantial number of [the statute's] applications [to protected speech] are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Id. at *6 (first alteration in original) (quoting United States v. Stevens, 559 U.S. 460, 473 (2010)) (internal quotation marks omitted). The court also concluded the statute was not unconstitutionally vague. Id. at *9.

In a plea agreement dated August 2, 2012, the government agreed to dismiss the identity theft charge against Sayer.[4] On August 13, 2012, Sayer entered a conditional plea of guilty to the

---

[4] The government has reserved the right to reinstate the identity theft charge in a superseding indictment if Sayer successfully challenges his cyberstalking conviction in this appeal.

cyberstalking charge, reserving the right to appeal from the district court's denial of his motion to dismiss that count in the indictment.

2.    Sentencing Proceedings

The Presentence Investigation Report (PSR) calculated Sayer's Guidelines sentencing range as 37 to 46 months, based on a total offense level of 19 and a criminal history category (CHC) of III.    As to the offense level, the PSR gave Sayer credit for acceptance of responsibility and deducted three levels from his base offense level of 18.    See U.S.S.G. §§ 2A6.2(a), 3E1.1.    It also added a four-level enhancement because Sayer's offense involved two "aggravating factors" under § 2A6.2(b): (1) a long-term pattern of stalking, threatening, or harassing behavior; and (2) violation of court protection orders that Jane Doe had against Sayer.

The PSR arrived at Sayer's CHC of III based largely on Sayer's state court convictions for in-person stalking of Jane Doe and violations of protection orders issued on her behalf.    These convictions arise from Sayer's conduct that pre-dates his July 2009 - November 2009 activities establishing his federal cyberstalking conviction.[5]

_____

[5]    These convictions include: (1) stalking based on Sayer's violations of a protection order issued on behalf of Jane Doe on January 19, 2007, as well as before that date; (2) violation of a condition of release based on in-person contact or close proximity with Jane Doe on several occasions, including on May 14, 2007; (3)

The PSR noted that Sayer had served a 22-month state sentence from July 1, 2010 through May 20, 2011. It said that a downward departure under U.S.S.G. § 5K2.23 may be warranted because fourteen months of that state sentence arose from a July 1, 2010 criminal complaint charging violations "related to the instant offense," including for Sayer's "ongoing harassment" of Jane Doe. Section 5K2.23 permits a downward departure if the defendant has "completed serving a term of imprisonment" and is eligible for an adjustment under § 5G1.3(b). Section 5G1.3(b), in turn, provides for an adjustment of a defendant's sentence if: "[1] a term of imprisonment resulted from another offense that is relevant conduct to the instant offense . . . and [2] that [other offense] was the basis for an increase in the offense level for the instant offense . . . ." U.S.S.G. § 5G1.3(b).

The district court held a sentencing hearing on December 4, 2012, at which the parties disputed whether Sayer was eligible for a § 5K2.23 downward departure. Defense counsel argued Sayer's conduct was "fungible, all this conduct is the same. He was prosecuted in the state system for it, received a significant jail sentence . . . and that's the basic underpinnings of our 5K2.23 argument." The government, in turn, argued that Sayer did not meet

violation of a condition of release for driving with a suspended license on January 19, 2009; and (4) violation of a protection order through contact or close proximity with Jane Doe on May 30, 2009.

the § 5G1.3 requirements referenced in § 5K2.23 because the 2010 offenses at issue were not the basis for the four-level enhancement to Sayer's offense level.

At the hearing, the district court inquired about a letter that the government had filed as a sentencing exhibit but was not included in the PSR. The letter was written by an inmate who had shared a jail cell with Sayer in Cumberland County Jail for two days in August 2011. Sayer's cellmate had mailed the letter to the Maine Computer Crime Unit right after being released from prison, and he also testified at Sayer's detention hearing before a magistrate judge on April 24, 2012.

The letter said that Sayer said he had "made [Jane Doe's] life into a living hell" by posting footage of them having sex. Sayer also told his cellmate that he "sent someone everyday to her house" in Maine, and "it got so bad" Jane Doe had to put up signs saying "they have the wrong person." On one occasion, she even "pushed some guy down the stairs." The letter also disclosed that Sayer asked the cellmate to get his friends who were "tough girls" to "beat the shit out of [Jane Doe]" and "make her swim and not come up from the water."[6]

---

[6] At Sayer's detention hearing, the cellmate testified that he had sent the letter because he was worried about Jane Doe's well-being. He also testified that he did not seek anything in return for the information in the letter other than help getting a valid Maine driver's license, which he could not obtain due mostly to fines owed for outstanding operating-under-the-influence offenses.

Jane Doe also testified at the sentencing hearing and recounted the progression of Sayer's stalking and harassment starting in 2006, when she ended their relationship, up until he was arrested in July 2010. She explained that what started out as "creepiness," with Sayer showing up at the places she frequented, "quickly . . . turned into something very scary." Jane Doe described the impact of Sayer's cyberstalking in particular, saying:

> From November [2008] until [Sayer] was arrested in July of 2010 man after man showed up at my house. It didn't matter the time of day; . . . I couldn't open my windows to let the fresh air in. I couldn't keep my blinds open to light. I felt scared to walk 25 feet out to my car. No longer was I afraid of just [Sayer]; I was afraid of any man who came near me because he was a potential predator. . . .
> It's very hard to sleep at night when there are predators coming to your home and banging on your windows. It's very hard to do anything. It's hard to live.
> [Sayer] had every intention o[f] terrorizing me and maybe even hurting me. I don't know how many times [a detective] called me up to say, . . . [Sayer] has planned a gang bang at your home tonight; you may not go home. Don't go home. It's not a safe place. . . .
> I can't even describe to you, really, in the words that I'm telling you how this has impacted my life . . . . I am forever changed. I will truly never be safe. . . . And so I am fearful of what happens when [Sayer] does get out of jail. . . . He knows what he did. He purposely did it. And I'm not so sure that it won't happen again. . . .

The court also heard testimony from witnesses who spoke briefly on Sayer's behalf, including his father, older brother,

sister, and nephew.  Sayer testified last, expressing remorse for the "hurt" he caused Jane Doe and "danger" he put her in, saying "I never . . . wanted physical harm to come to her, but I know now that it could have."  He also highlighted his good performance in prison and promised to continue counseling.

Sayer confirmed that he did not object to the PSR's description of the facts, which the district court adopted.  The court also adopted the PSR's Guidelines calculations, including the § 2A6.2(b) four-level enhancement to Sayer's offense level, resulting in a 37-46 month Guidelines range.

The district court acknowledged all of the parties' arguments at sentencing, including Sayer's argument for a § 5K2.23 downward departure.  However, the court chose to depart upward from the Guidelines range, imposing a five-year sentence, the statutory maximum.  The court said regardless of whether the above-Guidelines sentence is a departure under U.S.S.G. § 2A6.1 or an upward variance, it would reach the same result, explaining:

> [T]here are factors here that the sentencing commission simply has not considered in the guideline analysis.  And they are, for example, the use of anonymous third parties to harass the victim and the extra danger that that caused . . . [where the victim] has no idea of the limits [these third parties] might go to; the effect of posting on the Internet her identity, address, intimate details, all of which, as we know, is permanent, unlike situations where stalking occurred in a different era without the Internet; the many involvements that this defendant had with law enforcement, which did not deter him until the

final arrest; and the ongoing obsession that he apparently had even up until August of '11 as reflected by the letter and testimony of [Sayer's cellmate] at the detention hearing and the chilling things that the defendant was still possessing in his mind at that time.

We first address Sayer's constitutional challenges to the indictment before turning to his sentencing appeal.

II.

Sayer's constitutional challenges to § 2261A(2) are questions of law, which this court reviews de novo. See United States v. Floyd, 740 F.3d 22, 38 (1st Cir. 2014).

A.      As-Applied First Amendment Challenge

Under § 2261A(2)(A), a defendant must first have the intent "to kill, injure, harass, or place [a victim] under surveillance with intent to kill, injure, harass, or intimidate, or cause substantial emotional distress." Second, the defendant must engage in a "course of conduct" that actually "causes substantial emotional distress . . . or places [the victim] in reasonable fear of . . . death . . . or serious bodily injury . . . ." 18 U.S.C. § 2261A(2)(A). Sayer argues that because his course of conduct involved speech, or online communications, it cannot be proscribed in accord with the First Amendment. This argument is meritless.

"[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Giboney v.

-15-

Empire Storage & Ice Co., 336 U.S. 490, 502 (1949). For example, in Giboney the Court held that enjoining otherwise lawful picketing activities did not violate the First Amendment where the sole purpose of that picketing was to force a company to enter an unlawful agreement restraining trade in violation of a state criminal statute. Id. at 501-02. Speech integral to criminal conduct is now recognized as a "long-established category of unprotected speech." Stevens, 559 U.S. at 471. Sayer's online communications fall in this category.

Sayer does not claim that his acts of creating false online advertisements and accounts in Jane Doe's name or impersonating Jane Doe on the internet constitute legal conduct. In fact, he has admitted that his conduct, which deceptively enticed men to Jane Doe's home, put Jane Doe in danger and at risk of physical harm. To the extent his course of conduct targeting Jane Doe involved speech at all, his speech is not protected. Here, as in Giboney, it served only to implement Sayer's criminal purpose. See United States v. Rowlee, 899 F.2d 1275, 1278 (2d Cir. 1990) (applying Giboney exception to a conspiracy charge because the "act of conspiracy" does not implicate protected speech); United States v. Varani, 435 F.2d 758, 762 (6th Cir. 1970) (explaining that, as in the crimes of perjury, bribery, extortion and threats, and conspiracy, "speech is not protected by the First Amendment when it is the very vehicle of the crime itself").

The Eighth Circuit rejected a similar First Amendment challenge to § 2261A(2)(A) in United States v. Petrovic, 701 F.3d 849 (8th Cir. 2012). There, the defendant had created a website with links to images of his ex-wife "in the nude or engaging in sex acts" with him. Id. at 853. The defendant also sent sexually explicit pictures of his ex-wife to her work, her boss, and her relatives. Id. The court held that these "communications," which resulted in the defendant's § 2261A(2)(A) conviction, were integral to criminal conduct and unprotected under Giboney, as they carried out the defendant's extortionate threats to harass and humiliate his ex-wife if she terminated their sexual relationship. Id. at 855. As in Petrovic, Sayer points to no lawful purpose of the communications at issue here that would take them outside the Giboney exception.[7] Cf. United States v. Clemens, 738 F.3d 1, 12-13 (1st Cir. 2013) (rejecting as-applied challenge to criminal threat statute, 18 U.S.C. § 875(c), where jury could reasonably conclude that defendant's speech received no First Amendment protection). Nor can we surmise any on this record. Rather, his conduct lured potentially dangerous men to Jane Doe's doorstep, men

_____

[7] Sayer's citation of United States v. Cassidy, 814 F. Supp. 2d 574 (D. Md. 2011), does not assist him as the case is easily distinguishable on its facts and the pertinent law. Cassidy involved the application of § 2261A(2) to online commentary criticizing a public figure who led a Buddhist sect. Id. at 583, 586.

whom Jane Doe was not free to ignore.  As a result, § 2261A(2)(A)

has been constitutionally applied to Sayer.[8]

B.          Facial Challenge

          1.     Overbreadth

          Sayer asserts that § 2261A(2)(A) cannot be applied to

anyone because it is overly broad under the First Amendment, even

though the statute has been constitutionally applied to him.  "The

traditional rule is that a person to whom a statute may

constitutionally be applied may not challenge that statute on the

ground that it may conceivably be applied unconstitutionally to

others in situations not before the Court."  New York v. Ferber,

458 U.S. 747, 767 (1982).  But First Amendment overbreadth doctrine

is an exception:

> The showing that a law punishes a
> "substantial" amount of protected free speech,
> "judged in relation to the statute's plainly
> legitimate sweep," Broadrick v. Oklahoma, 413
> U.S. 601, 615 (1973), suffices to invalidate
> all enforcement of that law, "until and unless
> a     limiting     construction     or     partial

---

[8] In United States v. O'Brien, 391 U.S. 367, 376-77 (1968),
the Supreme Court announced a test to determine whether a
government regulation on a course of conduct that combines "speech"
and "nonspeech" elements comports with the First Amendment.  The
test applies only where the "communicative element in [the] conduct
is sufficient to bring into play the First Amendment."  Id. at 376.
Where, as here, all of the speech in Sayer's course of conduct is
excluded from the First Amendment's protection, we need not apply
the O'Brien test.  See Petrovic, 701 F.3d at 854-55 (not reaching
merits of the O'Brien test because communications at issue were
unprotected under Giboney).
     Even if O'Brien were applicable, Sayer has waived any argument
that § 2261A(2)(A) fails O'Brien's requirements.

> invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression," id. at 613.

Virginia v. Hicks, 539 U.S. 113, 118-19 (2003).  Assuming Sayer has standing to assert an overbreadth challenge, he bears the burden of showing "'from the text of [the law] and from actual fact,' that substantial overbreadth exists."   Id. at 122 (alteration in original) (quoting N.Y. State Club Ass'n, Inc. v. City of N.Y., 487 U.S. 1, 14 (1988)).

Sayer argues that because the text of § 2261A(2)(A) encompasses speech that causes only substantial emotional distress, it proscribes protected expression that is merely annoying or insulting.  His interpretation of § 2261A(2)(A) is unconvincing because it takes the term "substantial emotional distress" wholly out of context. See United States v. Williams, 553 U.S. 285, 294 (2008) (refusing to interpret words in statute in isolation because "commonsense . . . counsels that a word is given more precise content by the neighboring words with which it is associated"). Other circuits have rejected similar overbreadth claims. See Petrovic, 701 F.3d at 856 (concluding § 2261A(2)(A) mostly applies to conduct not protected by the First Amendment); United States v. Bowker, 372 F.3d 365, 378-79 (6th Cir. 2004) (rejecting overbreadth challenge to § 2261A's prohibition on conduct that places a person in reasonable fear of death or serious bodily injury) (vacated on other grounds, 543 U.S. 1182 (2005)).  The interstate stalking

-19-

statute, which prohibits a course of conduct done with "intent to kill, injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate, or cause substantial emotional distress" clearly targets conduct performed with serious criminal intent, not just speech that happens to cause annoyance or insult.

As to factual examples of unconstitutional applications of § 2261A(2)(A), Sayer points to only one: the anonymous speech criticizing a public figure and religious leader in <u>United States</u> v. <u>Cassidy</u>, 814 F. Supp. 2d 574 (D. Md. 2011). Otherwise, he lists hypotheticals that purport to exemplify the statute's overbreadth, even though § 2261A(2)(A) does not apply to most under a plain reading of the statute.[9] As a result, Sayer has not shown that § 2261A(2)(A) is substantially overbroad, either in an absolute sense or relative to its legitimate applications, so as to warrant the "strong medicine" of invalidating the entire provision. <u>L.A. Police Dep't</u> v. <u>United Reporting Publ'g Corp.</u>, 528 U.S. 32, 39 (1999) (quoting <u>Ferber</u>, 458 U.S. at 769); <u>see</u> <u>Williams</u>, 553 U.S. at

---

[9] For example, Sayer's hypothetical of a "jaded lover sending letters to an out-of-state organization or community with the <u>intent to annoy the ex-lover and diminish his reputation</u>" ignores the statute's specific intent requirement. (emphasis added). Similarly, his example of a journalist violating the statute by "accosting an out-of-state interviewee about [his or her] personal conduct" similarly ignores the statute's intent and causation requirements, as well as the requirement that the defendant engage in numerous acts, or "course of conduct," that amount to stalking. <u>See</u> 18 U.S.C. § 2266(2) (saying the "term 'course of conduct' means a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose").

303 ("The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" (quoting Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984))).

2.     Void for Vagueness

Sayer also states that § 2261A is impermissibly vague under the Due Process Clause of the Fifth Amendment because it does not provide fair warning of the conduct it prohibits and creates a risk of arbitrary enforcement. See Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). This claim is waived, as Sayer merely repeats his overbreadth argument and does not develop a separate and distinct argument under the vagueness doctrine.[10] See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); see also Holder v. Humanitarian Law Project, 561 U.S. 1, 20 (2010) (explaining the

---

[10]    We note that, in any event, § 2261A(2)(A) cannot be unconstitutionally vague as applied to Sayer where there is no doubt that the statute proscribed his course of conduct done with intent to harass and intimidate Jane Doe. See United States v. Shrader, 675 F.3d 300, 312 (4th Cir. 2012) (rejecting defendant's vagueness challenge to § 2261A(2)(A) where the statute "clearly proscribed [the defendant's] particular conduct"). As a result, Sayer lacks standing to assert that § 2261A(2)(A) is impermissibly vague as applied to hypothetical facts not before us. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed [by a statute] cannot complain of the vagueness of the law as applied to the conduct of others."); accord Blum v. Holder, 744 F.3d 790, 799 n.14 (1st Cir. 2014) (no standing to assert vagueness claim where plaintiffs' proposed conduct is clearly proscribed by statute).

difference between a First Amendment overbreadth claim and a Fifth Amendment vagueness challenge).

III.

Sayer also appeals from his sentence of sixty months' imprisonment, the statutory maximum. He argues that the district court should have departed downward under U.S.S.G. § 5K2.23 from his Guidelines range of 37 to 46 months rather than impose a variant sentence exceeding the top of the Guidelines range by fourteen months. Section 5K2.23 permits a reduction accounting for time served on prior convictions if two conditions are met: (1) the prior offense was based on conduct relevant to the defendant's federal crime; and (2) the prior offense increased the Guidelines offense level for the federal crime. U.S.S.G. § 5K2.23; U.S.S.G. § 5G1.3.

Sayer's argument, on appeal, that a § 5K2.23 downward departure was warranted merely because he was eligible for it ignores that the district court's refusal to depart downward was discretionary, regardless of his eligibility. United States v. Battle, 637 F.3d 44, 51-52 (1st Cir. 2011) (stating that decision not to depart downward from Guidelines range is discretionary). Nothing in § 5K2.23's text suggests it is an exception to the general rule that refusals to depart or vary from the Guidelines are discretionary. Rather, § 5K2.23 is explicit that a "downward departure may be appropriate" if its conditions are met. U.S.S.G.

-22-

§ 5K2.23 (emphasis added). Section 5K2.23's instruction that a "departure should be fashioned to achieve a reasonable punishment for the instant offense" emphasizes the discretionary nature of the decision. Id.

Here the district court was explicit that it did not need to decide whether Sayer in fact met the preconditions for a § 5K2.23 departure because its reasons for imposing a variant sentence at the statutory maximum also explain its refusal to depart downward. The court then articulated numerous reasons for its discretionary upward variance, including: (1) the extra danger and fear that Sayer caused by using "anonymous third parties" to harass Jane Doe, as "[Jane Doe] ha[d] no idea of the limits they might go to;" (2) the permanent nature of the intimate details that Sayer posted about Jane Doe online; (3) the fact that Sayer's many involvements with law enforcement did not deter him, until his final arrest; and (4) Sayer's "ongoing obsession" with Jane Doe, as evidenced by his cellmate's letter and testimony, which revealed the "chilling things that [Sayer] was still possessing in his mind" as late as August 2011. The court also addressed relevant sentencing factors, 18 U.S.C. § 3553(a), and noted that an above-Guidelines sentence was needed to keep Jane Doe and the public safe from Sayer, as well as to give Sayer enough time to receive treatment so that he does not repeat his behavior with Jane Doe or in another relationship.

The district court's reasoned decision to vary upward rather than depart downward under § 5K2.23 was not an abuse of discretion. See United States v. Santiago-Rivera, 744 F.3d 229, 234 (1st Cir. 2014) (reviewing reasonableness of variant sentence under "highly deferential abuse-of-discretion standard"). Sayer's claim that the district court did not give sufficient weight to certain mitigating factors, such as his participation in rehabilitation programs in state prison or the fact that he was an "exemplary inmate" without disciplinary problems, does not persuade us otherwise. We have said that the "mere fact that 'the sentencing court chose not to attach to certain of the mitigating factors the significance that the appellant thinks they deserved does not make the sentence unreasonable.'" Id. (quoting United States v. Clogston, 622 F.3d 588, 593 (1st Cir. 2011)). The district court "articulate[d] a plausible rationale" for the "sensible result" reached. United States v. Carrasco-De-Jesús, 589 F.3d 22, 30 (1st Cir. 2009). More is not required.

Finally, Sayer argues the district court erred in considering his cellmate's statements in its sentencing analysis because the PSR did not mention them and the government first introduced the statements for sentencing purposes at the sentencing hearing. His claim of lack of notice is not credible for three reasons. First, Sayer's defense counsel was at the April 24, 2012 detention hearing at which the cellmate testified and had

-24-

vigorously cross-examined the cellmate at that hearing. Second, Sayer knew before the sentencing hearing that the government would argue the cellmate's statements supported an above-Guidelines sentence because that is precisely what its sentencing memorandum had argued. Third, the government had filed the cellmate's letter as a sentencing exhibit with the district court several days before the sentencing hearing. See United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010) (holding that district court did not err in considering testimony from witnesses at defendant's trial for sentencing purposes where defendant had prior notice and the opportunity to challenge the reliability of the testimony); cf. United States v. Avilés-Santiago, ___ F. App'x ___, 2014 WL 983304, at *1 (1st Cir. Mar. 14, 2014) (holding that district court committed procedural error where it increased defendant's sentence, without any prior notice to the defendant, based on a conclusion it had drawn solely from the separate proceeding of a co-defendant).

Sayer also contends the cellmate's statements were unreliable because of his criminal history, drug addiction, and access to Sayer's discovery materials while they were in jail together. The cellmate, however, had denied seeing Sayer's discovery materials at the detention hearing, and the magistrate judge who presided over that hearing found his testimony to be credible. Under these circumstances, the district court did not abuse its discretion in deeming the cellmate's testimony reliable

and so relying on it at sentencing.  See United States v. Platte, 577 F.3d 387, 392-93 (1st Cir. 2009) ("[C]redibility determinations are part of the sentencing court's basic armamentarium. . . .  [A] reviewing court must cede a sentencing court wide latitude in determining the probative value of . . . testimony.").

## IV.

For the reasons stated above, we affirm.