# United States Court of Appeals
## For the First Circuit

No. 15-1523

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL HENRY, a/k/a LT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Kayatta and Barron, Circuit Judges,
and McAuliffe,* District Judge.

Robert R. Herrick for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with
whom Thomas E. Delahanty II, United States Attorney, was on brief,
for appellee.

June 17, 2016

* Of the District of New Hampshire, sitting by designation.

**KAYATTA**, **Circuit Judge**. Paul Henry entered a conditional guilty plea under Federal Rule of Criminal Procedure 11(a)(2) to two counts of sexual exploitation of children in violation of section 2251(a) of Title 18 of the United States Code ("section 2251(a)"). By agreement with the government, he reserved his right to appeal two issues: the district court's determination that he was not entitled to raise a "mistake of age" defense; and the district court's denial of his motion to suppress evidence found or seized in connection with a search of Henry's motel room. Finding that neither determination by the district court was in error, we affirm.

## I.  Background[1]

On February 12, 2014, the police department in Portland, Maine, received a report from an agent in the Detroit, Michigan, office of the Department of Homeland Security Investigations ("HSI") about a nineteen-year-old female ("A.H.") being held against her will at a Portland hotel. A.H. had previously been a victim of sex trafficking and may have been

---

[1] Henry challenges the district court's application of law to the facts, but does not challenge as clearly erroneous its findings of fact. Therefore, we, like Henry, recite the relevant facts as drawn from the district court's order denying Henry's motion to suppress. Order on Motion to Suppress at 3, United States v. Henry, No. 2:14-cr-64-JDL (D. Me. Oct. 17, 2014), ECF No. 47. See United States v. Paneto, 661 F.3d 709, 711–12, 713 n.1 (1st Cir. 2011) (reciting facts as supportably found by the district court when defendant did not challenge the district court's factual findings).

trafficked from Michigan to New York for purposes of prostitution. She was developmentally delayed, functioning at the level of an eleven- or twelve-year-old.

Upon examining guest lists at Portland-area hotels where prostitution and other illegal activities were known to occur, Portland Police Officer Mark Keller discovered that Henry was staying at a nearby motel. Officer Keller was familiar with Henry because Henry had previously been identified by the Portland Police Department, the Maine Drug Enforcement Agency, and other federal agencies as a person involved in drug and sex trafficking in the Portland area. Henry also had an extensive criminal history in New York for charges related to drug distribution, weapons, firearms, and resisting arrest. The Portland police did not then have information specifically linking Henry to A.H., but they did know he was linked to sex trafficking in New York and to the temporary disappearance of a fifteen-year-old female from the Portland area in July 2013.[2]

---

[2] An aunt who reported the girl's disappearance reported that the girl may have been trafficked out-of-state for purposes of prostitution. The girl subsequently returned home accompanied by a person named "L.T.," a pseudonym occasionally used by Henry. Approximately two weeks later, Henry's vehicle was stopped by the Portland Police and Officer Keller was called to the scene. Henry consented to the examination of his two cell phones. On one of the phones, Officer Keller found text messages between Henry and the girl, who was also listed among Henry's contacts. Henry was not arrested at the time.

When they arrived at the motel, Officer Keller and Officer Daniel Townsend observed Henry's car in the parking lot. They obtained Henry's room number and, joined by Sergeant Frank Gorham, went to his room to perform a "knock and talk."[3] In the hallway outside Henry's room, the officers observed drug paraphernalia and various people whom, the officers suspected, were engaged in drug- and prostitution-related activities.

After knocking and announcing their presence as police, the officers heard the sounds of a flushing toilet, running water, people moving about quickly inside the motel room, and something that sounded like a metal object hitting the floor. Approximately ninety seconds later, Henry opened the door to a room that smelled of recently smoked marijuana. Officer Townsend introduced himself and told Henry that the officers wished to speak with him and ask him questions. Officer Townsend asked whether the officers could step inside the motel room because of the activity and traffic in the hallway, and Henry agreed.

Officer Townsend performed a protective sweep of the room, during which he found a bag containing what appeared to be marijuana at the foot of one of the two beds. He then positioned himself in the middle of the room, facing the door. The officers

---

[3] A "knock and talk" occurs when police officers approach a residence without a search warrant, and "seek[] to speak to an occupant for the purpose of gathering evidence." Florida v. Jardines, 133 S. Ct. 1409, 1423 (2013) (Alito, J., dissenting).

- 4 -

observed that a light was on in the bathroom and they heard running water and movement inside. When asked who was in the bathroom, Henry responded "my girl," who he referred to, after a pause, as "Big Sasha." When asked for her real name, he said he thought it was "Allure." Without being asked, Henry informed the officers that she was from Michigan, and he began to appear more anxious. Upon the officers' request, the young woman exited the bathroom and Officer Keller recognized her as A.H., whom he had seen in a photograph. When Officer Keller asked A.H. to step into the hallway so they could speak privately, Henry protested and yelled at A.H. that she did not have to speak to the officers or answer any questions.

After A.H. left the room with Officer Keller, Officer Townsend asked Henry to sit down in a chair near the corner of the room because Henry had become increasingly excited as A.H. left the room. Henry obliged. Officer Townsend spoke with Henry in a conversational manner, keeping a clear passage between where Henry was seated and the room's door in order to avoid creating a custodial situation. From his conversation with Henry, Officer Townsend learned that Henry knew very little about A.H. Henry became increasingly nervous, glancing repeatedly at a jacket hanging on a clothes rack in the corner of the room, appearing concerned about something in that area. On the floor near the rack, Officer Townsend saw a metal hanger, which he inferred had

created the metal sound he had heard immediately after the officers had knocked on the door. He also recalled having seen one of the hangers swaying on the rack when he first entered the room. Henry continued to glance at the jacket, which had a visible bulge in one of its pockets. Officer Townsend grew concerned that there might be a weapon in the pocket, so he patted the outside of the jacket. From the feel and sound of the object inside the pocket, he recognized it as being a large amount of cash wrapped in plastic. Officer Townsend removed the item from the pocket, finding a single plastic bag containing wads of cash wrapped in three separate plastic bags, about four inches thick in total, folded in different denominations with rubber bands. The money was later determined to total approximately $12,700. Henry initially claimed that his mother had given him the money, but he could not explain why he did not keep it in a more secure location.

Officer Townsend observed two smart phones sitting in plain view: an iPhone sitting on the bed and a Nokia plugged into the wall next to the television. When asked about the phones, Henry became nervous, answering that he used the iPhone to take pictures and that the Nokia "really wasn't his." Knowing that people involved in sex trafficking often use cell phones to set up "dates," communicate with prostitutes, and take pictures of prostitutes to post on websites, Officer Townsend asked Henry for

the phone numbers of the phones and for the iPhone's password, all of which Henry provided.

Officer Keller interviewed A.H. separately. She stated that she had met Henry in Brooklyn, New York, that they had driven together to Maine, and that she had known him only for a couple of days. She did not know his name, and although she said that Henry treated her "okay," she said that she did not want to stay with him or go back in to the room, and that she had seen a silver firearm in the motel room the previous day. After speaking with Officer Keller, Officer Townsend called Maine Assistant Attorney General Leanne Sutton, who told him to seize the phones and money and to apply for a search warrant.

Officer Townsend told Henry that the police would seek a search warrant to search the motel room and that if he did not want to wait while the warrant was obtained, he could leave after Officer Townsend checked his clothing and any other items Henry wanted to take with him. Henry was issued a summons for possession of a useable amount of marijuana, got dressed, and left. The entire encounter in the motel room lasted approximately ten to fifteen minutes.

A series of search warrants was subsequently issued, the first to search the motel room and Henry's car. The second search warrant, issued a week later, authorized the search of the iPhone and Nokia phone that had been seized without a warrant and then

retained pursuant to the first search warrant at Portland Police headquarters. The affidavits for the first and second warrants included information obtained from the officers' conservations with A.H. The affidavits did not include any information about A.H.'s developmental disability.

The search of the iPhone conducted pursuant to the second warrant yielded a video located in an application on the phone that depicted Henry engaging in sexual intercourse with a young woman whom Officer Keller recognized as the fifteen-year-old girl ("M.V.") who had been reported missing and connected to Henry in July 2013. The video was stored in an application named "TangoME," which had been used to send the video to a Yahoo.com email account. A third search warrant authorized a more in-depth search of the iPhone and the ensuing search revealed additional videos of M.V. and Henry engaged in sexual conduct. A federal arrest warrant was then sought and obtained.

The two counts of violating section 2251(a) to which Henry pleaded guilty arose out of the videos discovered on the iPhone. Henry sought to suppress, among other things, the cash, his possession of which was cited in the affidavits to obtain the warrant to search the videos, and the videos themselves, contending that the searches leading to their discovery were unlawful. He also filed a motion in limine asking the district court to rule that, at trial, he would be entitled to assert a "mistake of age"

defense based on his contention that M.V. told him that she was nineteen years old.  After the district court denied both motions, Henry entered and the court accepted his conditional guilty plea.  In accepting the plea, Henry admitted that on January 25 and 26, 2014, he used the video function of his iPhone to film two videos of himself and M.V. engaging in sexual activity, and that between January 27 and January 30, 2014, he used an application on his iPhone to transmit one of the videos to approximately ten people.  Henry was sentenced to 180 months in prison on each count, to run concurrently, followed by five years of supervised release on each count, also to run concurrently.

## II.   Analysis

### A.   Motion in Limine

We review de novo Henry's argument that section 2251(a) must be construed to allow a "mistake of age" defense in order to pass constitutional muster.  United States v. Carter, 752 F.3d 8, 12 (1st Cir. 2014).  We begin by discussing the statutory provision at issue.  Section 2251(a) states that

> [a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of

such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a).

The foregoing text plainly does not require that a person convicted of violating the statute needs to know the actual age of the minor victim. We recently explained, in United States v. Ford, No. 15-1303, 2016 WL 1458938 (1st Cir. Apr. 13, 2016), that when a statute is silent as to a required state of mind, "we turn to a line of Supreme Court 'cases interpreting criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them,'" id. at *4 (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 70 (1994)). Of import in this case, however, is our recognition that "[t]his long-standing rule of statutory interpretation may be overborne by 'some indication of congressional intent, express or implied, . . . to dispense with mens rea as an element of a crime.'"

- 10 -

Id. (omission in original) (quoting Staples v. United States, 511 U.S. 600, 606 (1994)(italics omitted)).

The House Conference Report on the version of section 2251(a) that Congress enacted contains such an indication. It states:

> The Senate bill contains an express requirement in proposed section 2251(a) that the crime be committed "knowingly." The House Amendment does not. The Conference Substitute accepts the House provision with the intent that it is not a necessary element of a prosecution that the defendant knew the actual age of the child.

H.R. Rep. No. 95-811, at 5 (1977) (Conf. Rep.).

### 1. First Amendment

Given this clear indication overriding our general presumption in favor of a scienter requirement in criminal statutes, one might conclude without further ado that the defendant's knowledge or lack of knowledge concerning the victim's actual age is irrelevant in a prosecution for violating section 2251(a). Henry, though, points to the Ninth Circuit's decision in United States v. United States District Court, 858 F.2d 534 (9th Cir. 1988) ("District Court"), holding that section 2251(a) unconstitutionally suppresses protected speech unless an affirmative lack of scienter defense is read into the statute, id. at 540-44. Relying on District Court, Henry claims that the threat of strict criminal liability under section 2251(a) will deter the

production of a substantial amount of constitutionally protected pornography using young adult performers because it is not always possible to be certain that a person is as old as the person claims to be. While Henry presses no argument that he has or will be so deterred, First Amendment overbreadth doctrine accords Henry standing to raise such a challenge. See New York v. Ferber, 458 U.S. 747, 767–69 (1982); United States v. Sayer, 748 F.3d 425, 434–35 (1st Cir. 2014) (citing Ferber, 458 U.S. at 767). Further, he contends that the availability of such an affirmative defense could have altered the outcome of his case, because M.V. told him she was nineteen years old.

Overbreadth doctrine is "strong medicine" to be employed with hesitation, "and then 'only as a last resort.'" Ferber, 458 U.S. at 769 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)). "[P]articularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick, 413 U.S. at 615.

Since the Ninth Circuit issued its opinion in District Court, the Supreme Court has pointed to the limited scienter requirements of section 2251(a) without raising an eyebrow, X-Citement Video, Inc., 513 U.S. at 76 n.5,[4] and five other circuits

---

[4] Henry would have us read X-Citement Video as favorable to his claim because it held that to convict a distributor or receiver

- 12 -

have since rejected the reasoning and rationale adopted by the Ninth Circuit. See United States v. Fletcher, 634 F.3d 395, 404 (7th Cir. 2011); United States v. Humphrey, 608 F.3d 955, 962 (6th Cir. 2010); United States v. Pliego, 578 F.3d 938, 943-44 (8th Cir. 2009); United States v. Malloy, 568 F.3d 166, 176-77 (4th Cir. 2009); United States v. Deverso, 518 F.3d 1250, 1257-58 (11th Cir. 2008). We have yet to offer any view on the issue. United States v. Encarnación-Ruiz, 787 F.3d 581, 584 n.1 (1st Cir. 2015).

We adopt the majority view. "It is evident beyond the need for elaboration that [the government's] interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" Ferber, 458 U.S. at 756-57 (quoting Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607 (1982)). The government promotes this compelling interest by requiring the producers of pornography to be certain that performers of pornographic acts are not minors. See id. At the same time, there

---

of child pornography under 18 U.S.C. § 2252, the government must prove that the person knew the age of the actors depicted, X-Citement Video, Inc., 513 U.S. at 78. In so doing, however, the Supreme Court explicitly distinguished section 2251 from section 2252. The Court analogized section 2251(a) to sex offenses, such as rape, which it said are frequently "expressly excepted" from the presumption of mens rea, because producers, unlike distributors or receivers, "confront[] the underage victim personally and may reasonably be required to ascertain that victim's age." Id. at 72 n.2. And "[t]he opportunity for reasonable mistake as to age" is more likely to arise "once the victim is reduced to a visual depiction, unavailable for questioning by the distributor or receiver." Id. X-Citement Video, therefore, harms, rather than helps, Henry's cause.

- 13 -

is no indication, or reason to think, that section 2251(a) as written has substantially chilled the production of constitutionally protected pornography. Rather, common sense suggests--and the record does not belie--that producers of pornography simply take added care to verify the ages of their performers, rather than foregoing production.[5] Malloy, 568 F.3d at 176 & n.8.

Of course, we recognize that the widespread use of smart phones with photographic and video capabilities has led to an apparent explosion in the "production" of pornographic images by amateurs in non-commercial settings, who presumably pay less attention to regulatory requirements, criminal or otherwise. This phenomenon does suggest the possibility that these amateur producers might not employ the methods that commercial producers employ to verify the ages of those who are filmed. On the other hand, it may well be that the amateurs are more likely to know their subjects. And the technology that makes amateur video production and distribution easier also tends to make it easier to verify ages. See Gilmour v. Rogerson, 117 F.3d 368, 372-73 (8th

---

[5] In fact, pornography producers are already required to authenticate actors' ages. See 18 U.S.C. § 2257(b)(1) (requiring producers to "ascertain, by examination of an identification document containing such information, the performer's name and date of birth, and require the performer to provide such other indicia of his or her identity as may be prescribed by regulations").

Cir. 1997) ("In this information age, a prudent photographer or movie producer may readily and independently confirm the age of virtually every young-looking model."). In any event, such an apparent proliferation of pornography provides no support for a claim that section 2251(a) is chilling a substantial amount of speech in relation to the plain scope of its reach.

## 2. Fifth Amendment

Henry argues, next, that a criminal conviction of an offense with a minimum fifteen-year sentence, see 18 U.S.C. § 2251(e), violates the Fifth Amendment right to due process in the absence of some showing of at least a lack of care in failing to determine that the person depicted was at the time a minor. As authority for this contention, Henry points to Lambert v. California, 355 U.S. 225, 229-30 (1957). Lambert, however, expressly acknowledged the general rule that "[t]here is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition." Id. at 228. Lambert found that latitude exceeded in a case where the criminal conduct consisted solely of a failure to act in the absence of any reason to think one need act (i.e., by failing to register with city officials as a felon). Id. Here, Henry is charged with his affirmative action, and he points to no authority establishing or even suggesting that Congress could not

- 15 -

criminalize such action while also eliminating any scienter requirement.

Furthermore, there is no per se prohibition on strict liability crimes coming with mandatory minimum sentences. In McQuoid v. Smith, 556 F.2d 595 (1st Cir. 1977), we held that mandatory sentences for a strict liability crime do not violate the Eighth Amendment as long as they are not "grossly disproportionate" to the crime, id. at 599. Given the seriousness of the crime at issue here--sexual exploitation of a minor--we cannot say that a mandatory minimum sentence of fifteen years is "grossly disproportionate."

## B. Motion to Suppress

Henry's motion to suppress addressed numerous issues, but his appeal only addresses the pat-down and seizure of the cash from the jacket, the search and seizure of the smart phones, and the district court's refusal to conduct a testimonial hearing concerning the adequacy of the search warrants. He contends that the officers lacked probable cause for these searches and seizures, and that therefore all subsequent events (e.g., the follow-up warrants to search the phones, the discovery of the videos with the minor, his arrest), were "fruits of the poisonous tree" and so must also be suppressed. Wong Sun v. United States, 371 U.S. 471, 488 (1963).

Henry does not challenge the district court's findings of fact. We review his challenge to the court's application of the relevant laws to these facts de novo. United States v. Cameron, 699 F.3d 621, 637 (1st Cir. 2012).

1.  **Jacket Pocket Search and Seizure of Cash**

The affidavit used to procure the warrant to search the iPhone on which the police discovered the incriminating videos pointed to the cash found in Henry's jacket. Henry argues that the search and seizure of the cash was unlawful and that the subsequent warrant was, as a result, the fruit of an unlawful search.

"[T]he police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." Terry v. Ohio, 392 U.S. 1, 20 (1968). The Supreme Court recognizes an exception to this requirement in certain circumstances. In Terry, the Court held that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

Id. at 30. The permissible scope of pat-down searches includes areas within the suspect's immediate control from which he may

- 17 -

gain possession of a weapon.  <u>Michigan</u> v. <u>Long</u>, 463 U.S. 1032, 1048 (1983).  This rule seeks to protect officer safety.  <u>See</u> <u>United States</u> v. <u>Romain</u>, 393 F.3d 63, 75 (1st Cir. 2004).

On appeal, Henry does not appear to dispute that a reasonable suspicion of criminal activity existed at the time Officer Townsend performed the pat-down of his jacket.[6]  Henry instead claims that the jacket, which was approximately eight feet from where Henry sat, "was well outside of [his] reach," and that the officers had "positioned themselves strategically . . . to limit his range of movement."  Henry, though, got up from the chair a few times during his conversation with Officer Townsend.  And Officer Townsend testified that he specifically positioned himself to avoid a custodial situation, suggesting that Henry was free to leave at any time and therefore could have accessed the jacket.

---

[6] Nor could he, given the motel's known involvement in drug and sex trafficking, the presence of drug paraphernalia in the motel hallway, Henry's history of drug- and sex-trafficking related charges, his link to the 2013 disappearance of a fifteen-year-old girl in Portland, his sketchy answers to questions about A.H., the marijuana found in the motel room, the smell of marijuana in the motel room, the sounds heard before Henry opened the door that were consistent with the movement of persons attempting to dispose of or hide contraband, and Henry yelling at A.H. not to answer the officers' questions, among other things.  The totality of the circumstances demonstrated that Officer Townsend's apprehension of danger was reasonable.  <u>See</u> <u>United States</u> v. <u>Arnott</u>, 758 F.3d 40, 44–45 (1st Cir. 2014) (officer had reasonable suspicion that defendant posed a danger during a traffic stop when defendant appeared nervous when questioned, and the officer had reason to believe that vehicle occupants had just conducted a drug transaction because "[t]he connection between drugs and violence is, of course, legendary").

Furthermore, the fact that Henry was eight feet from the jacket does not necessarily mean the jacket fell outside the vicinity within which Officer Townsend could perform a pat-down if he had a reasonable suspicion that the jacket may contain a weapon. In United States v. Nascimento, 491 F.3d 25 (1st Cir. 2007), we upheld an officer's incidental search of a closet even though the unrestrained arrestee was eight to ten feet from the closet and two officers were positioned between him and the closet, id. at 50-51. Given that Henry was not yet under arrest, not restrained, and not prohibited from moving about the room, Officer Townsend was permitted to perform the pat-down based on his reasonable concern that the jacket may have contained a weapon.

Henry next claims that even if the pat-down of the pocket was lawful, Officer Townsend did not have authority to reach into the pocket and seize the money. During a lawful Terry pat-down, the "plain feel exception"--an extension of the "plain view doctrine"--permits an officer to seize an object if its incriminating identity is immediately apparent. Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). The plain feel doctrine does not, however, permit an item to be seized if its incriminatory nature only comes to light after further inquiry or search, such as "squeezing, sliding [or] otherwise manipulating the contents of the defendant's pocket." Id. at 378 (quoting State v. Dickerson, 481 N.W.2d 840, 844 (Minn. 1992)).

Henry argues that the incriminating nature of the cash --and thus probable cause to seize it--only came to light after further inquiry, in the form of counting the cash to determine that it was a large amount of money (and therefore more indicative of its criminal nature), and asking Henry where the money came from and why it was not kept in a more secure location. Cf. United States v. Schiavo, 29 F.3d 6, 9 (1st Cir. 1994).

The district court, however, did not rely on this subsequent inquiry to conclude that Officer Townsend had "appropriate reasonable suspicion" to seize the cash. Order on Motion to Suppress at 25, United States v. Henry, No. 2:14-cr-JDL (D. Me. Oct. 17, 2014), ECF No. 47 [hereinafter "Order on Motion to Suppress"]. Rather, the district court rested its conclusion on its finding that "Officer Townsend recognized from his initial pat-down that the bulge in Henry's pocket was a large amount of cash" and that he was "immediately aware of the cash's incriminating nature." Id. at 25–26 (emphasis supplied). In contrast, the officer in Schiavo admitted that he did not immediately know what was in the defendant's pocket after conducting the pat-down and only became aware of its contents after removing the item. Schiavo, 29 F.3d at 9. Henry does not claim that the district court clearly erred in finding the officer's testimony concerning his remarkable powers of discernment to be credible, so we deem it to be correct. See United States v.

- 20 -

Paneto, 661 F.3d 709, 713 n.2 (1st Cir. 2011). Officer Townsend further testified that in his experience, cash found on suspects is frequently deemed contraband in drug- and sex-trafficking crimes, and the district court--in its capacity as factfinder and credibility assessor--accepted this version of the facts. Cf. United States v. Sepulveda, 15 F.3d 1161, 1201 (1st Cir. 1993) (district court entitled to find it "reasonably probable that confiscated cash represents either drug profits or money dedicated to the upcoming purchase of contraband"). Officer Townsend's seizure of the cash was therefore permissible because he had probable cause to believe that the cash was evidence of drug or sex trafficking.

### 2. Smart Phones

Henry also claims that the district court should have suppressed the evidence obtained from the smart phones because the officers lacked appropriate justification to seize the phones in the first instance. The district court concluded that the seizure of the phones was lawful because they were found "in plain view" after the officers "acquired sufficient information to have probable cause to believe that the phones were contraband associated with sex trafficking."[7] Order on Motion to Suppress at 27.

_____

[7] The district court relied on the plain view doctrine in concluding that the seizure of the cell phones was lawful. It did

- 21 -

Under the "plain view" doctrine, a search warrant is not required for a seizure if three requirements are met: (1) the officers' presence at the point of discovery is lawful; (2) the discovery of the seized item is inadvertent; and (3) the item's evidentiary value is immediately apparent. United States v. Rutkowski, 877 F.2d 139, 140-41 (1st Cir. 1989). Henry focuses on the third requirement, arguing that the officers did not have probable cause to believe the phones had immediately apparent evidentiary value.

We disagree. At the time he seized the phones, Officer Townsend had probable cause to believe the phones had evidentiary value based on (1) Henry's nervousness and anxiety when questioned about the phones; (2) Henry's statement that he used the phones to take photographs, which Officer Townsend believed was significant in the context of a sex-trafficking investigation; (3) the possible existence of a sex-trafficking relationship with A.H., given the large sums of cash found in the motel room, Henry's inability to provide much information about A.H.'s identity, and his statement that A.H. was from Michigan, which connected her to the report received from the Michigan HSI; and (4) the fact that Officer Keller knew that Henry had previously used a phone to contact the fifteen-year-old girl who had been reported missing in Portland

---

not make a finding of consent to the seizure. Order on Motion to Suppress at 27.

- 22 -

and suspected of being involved in trafficking, see supra n.2. And although using a phone to take photographs is not inherently criminal, in the context of a sex-trafficking investigation, and based on Officer Townsend's knowledge and experience that smart phones are frequently used to take photographs of sex trafficking victims and to facilitate prostitution, this, along with the other information known to him at the time, was enough for Officer Townsend to have probable cause to believe that the phones likely had evidentiary value in the investigation of the suspected crimes.

Henry nevertheless suggests that Riley v. California, 134 S. Ct. 2473 (2014), calls for greater caution in allowing the warrantless seizure of a smart phone. Riley's concerns about the warrantless search of digital data stored within a smart phone are not implicated here, however, because by the time the phones were searched, a warrant had been obtained. It thus appears that the officers did exactly what the Supreme Court suggested they do: seize the phones to prevent destruction of evidence but obtain a warrant before searching the phones. Cf. id. at 2486–87.

### 3. **Franks Hearing**

In his motion to suppress, Henry challenged the affidavits used to procure the first and second warrants because they failed to mention A.H.'s developmental disability. Based on that omission, Henry sought a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), to challenge the issuance of the

warrants. To secure such a hearing, Henry had to make "a substantial preliminary showing," id. at 155, "(1) that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood or omission was necessary to the finding of probable cause," United States v. Rigaud, 684 F.3d 169, 173 (1st Cir. 2012). The burden is on the challenger to make these showings by a preponderance of the evidence. United States v. Graf, 784 F.3 1, 11 (1st Cir. 2015).

Based on the record and upon reviewing the affidavits issued in support of the first and second warrants, the district court concluded that the omission of A.H.'s developmental delays was not "material to such a degree that had the judicial officer been so informed, the officer would have been unwilling to rely on the information included in the affidavit that was attributed to A.H." Order on Motion to Suppress at 28. We review that conclusion for clear error. Rigaud, 684 F.3d at 174. "Clear error 'exists only when we are left with the definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. D'Andrea, 648 F.3d 1, 14 (1st Cir. 2011)).

Even if we omit from the two affidavits all of the information gleaned from conversations with A.H., both affidavits are left with plenty of information to support the magistrate's determination that there was "a fair probability that contraband

or evidence of a crime will be found in a particular place." United States v. Reiner, 500 F.3d 10, 15 (1st Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  In the affidavit supporting the first warrant, which authorized the search of Henry's motel room and car, Officer Keller included the following information that was not obtained from A.H.:

- The information from HSI Special Agent Cara Rose that a woman named A.H. from Michigan was a possible victim of trafficking and may be in a Portland-area hotel;

- Officer Keller's personal knowledge that Henry has been associated with prostitutes and drug activity in the Portland area;

- The odor of marijuana in the motel room;

- Henry's statement that A.H. was from Michigan, connecting her to the report from Michigan HSI;

- The identification of the woman who emerged from the bathroom as A.H. based on photos sent by investigators;

- Henry yelling at A.H. and telling her not to talk to the officers;

- Henry's inability to give much information about A.H.;

- The large amounts of cash found by Officer Townsend. Officer Keller knew "through training, education, and experience that subjects involved in drug and sex

trafficking possess large quantities of money in exchange for product and/or services";

- The two cell phones. Officer Keller knew "through training, education, and experience that subjects involved in drug and sex trafficking carry multiple cellular phones for the furtherance of their criminal activity"; and

- Officer Keller's knowledge of Henry's prior criminal history in New York.

Similarly, Officer Townsend's affidavit provided in support of the second warrant to search the cell phones would be supported by probable cause even if the information gleaned from A.H. was omitted, based on:

- The information from Special Agent Rose that a woman named A.H. was a possible victim of trafficking and may be in a Portland-area hotel;

- Officer Townsend's familiarity with Henry from previous contacts and knowledge that he is associated with drug and sex trafficking;

- The identification of A.H. as the woman who emerged from the bathroom;

- Henry's inability to inform Officer Townsend of A.H.'s name. "Due to [his] education, training, and experience," Officer Townsend knew "that subjects

- 26 -

involved with both drug and sex trafficking are unaware of their accomplices' legal names";

- Henry's growing anxiety when asked information about the phones;

- The fact that he knew, "[d]ue to [his] education, training, and experience," that subjects involved in drug and sex trafficking carry multiple cellular phones for the furtherance of their criminal activity;

- The discovery of marijuana during the protective sweep; and

- Henry's "furtive conduct" and subsequent discovery of a large sum of cash in his jacket pocket, which is "indicative of drug and sex trafficking."

Based on the foregoing information that was contained in the affidavits and that was not obtained from A.H., we simply cannot say that the district court erred, let alone clearly erred, in concluding that Henry had not shown, by a preponderance of the evidence, that the failure to mention A.H.'s disability affected the probable cause determination reached in issuing the first and second warrants.

### III. Conclusion

The judgment of the district court is <u>affirmed</u>.