Hoekstra, J.
In November 2016, petitioner, Stacia Buchanan, obtained an ex parte personal protection order (PPO) against respondent, John Crisler. Crisler filed a motion to terminate the PPO, and his motion was denied in March 2017. Crisler now appeals as of right the denial of his motion to terminate the PPO. For the reasons explained in this opinion, we vacate the trial court's order to the extent it relates to Crisler's online postings, and we remand for a determination of whether Crisler's posts violated MCL 750.411s(1). In all other respects, we affirm.
*890 I. FACTS AND PROCEDURAL HISTORY
Buchanan is a licensed Michigan attorney. In 2011, she was appointed by the 55th District Court to represent Crisler against a criminal charge of misdemeanor domestic violence. Following a jury trial, Crisler was convicted. Buchanan represented Crisler through sentencing, but she withdrew from the case before the matter of restitution had been resolved because of a breakdown of the attorney-client relationship.
Crisler was highly dissatisfied with Buchanan's representation during the criminal proceedings. After Buchanan withdrew from Crisler's criminal case, Crisler made efforts to communicate this dissatisfaction to Buchanan personally and to broadcast his dissatisfaction on the Internet. Crisler's first such contact with Buchanan occurred on November 10, 2011, when Crisler sent Buchanan an e-mail, which stated:
Ms. Buchanan:
We have proof positive you aided and abetted the Prosecution.
Do you remember when I promised I would make you famous? (and all though legal, moral and ethical means).
Be well!
Regards,
John Crisler DO
Anti-Aging Medicine
Buchanan responded to this e-mail on the same day, informing Crisler that she no longer represented him and that his e-mail was "unnecessary and unwanted." Buchanan instructed Crisler not to e-mail her again.
Over the next several years, Crisler repeatedly posted comments about Buchanan on his website, on Facebook, and occasionally in the comments sections of online news articles. Briefly stated, in these various online postings, Crisler expressed his dissatisfaction with Buchanan's representation during the criminal proceedings. Crisler believed that Buchanan, along with the prosecutor and district court judges, had "planned" his conviction, and his postings constitute a long list of complaints about Buchanan's performance as his attorney as well as allegations against the district court judges and the prosecutor.
In 2012, Buchanan received e-mails from two strangers, informing her of Crisler's online postings. In particular, on August 16, 2012, someone named Michael Scally e-mailed Buchanan to inform her that Crisler had made a number of defamatory posts about her on the Internet. Scally's e-mail contained links to Internet postings by Crisler. Similarly, on October 7, 2012, someone named Charles Grashow e-mailed Buchanan to ask whether she was aware of what Crisler was posting about her online. Grashow's e-mail contained a link to Crisler's website and a suggestion that Buchanan "go thru it-a fun read." Both Scally and Grashow were strangers to Buchanan.
On February 28, 2013, Crisler again e-mailed Buchanan directly, sending a message with links to his Facebook page and website. The message stated:
Ms. Buchanan-
You are famous!
[Facebook and website links]
Is this an "unwanted email"? Well, I didn't "want" you to purposely destroy my life!
You should be thinking about what you are going to do when you are no longer an attorney. Right after my REAL attorney files his Motion with the Circuit Court, I will file my formal complaint against you with the Michigan Attorney Grievance Commission.
*891 ... you won't have those two corrupt Judges there to protect you. They will be busy fielding their own complaints.
One day you are going to tell me why you decided to destroy my life. There is no way I can ever get back what you have cost me!
Be well!
Regards,
John Crisler DO
Aside from Crisler's electronic postings and messages, Buchanan had a few in-person contacts with Crisler beginning in April 2015, when Buchanan "ran into" Crisler in the parking lot of the courthouse. Crisler did not approach Buchanan, and they did not speak. However, later that day, Buchanan received an e-mail from Facebook, informing her that she had been "tagged" by Crisler. Buchanan immediately adjusted her Facebook privacy settings to prevent Crisler from tagging her in the future.
Beginning in April 2015, Buchanan also noticed Crisler at various running races in which she participated. Initially, nothing occurred at these races between Buchanan and Crisler to make Buchanan uncomfortable. However, on May 6, 2016, Buchanan again saw Crisler in person at a race. According to Buchanan, when the race started Crisler "ran past" her and "got right in front of" her "so that there was no other runner between" them. Eventually, Crisler slowed down enough that Buchanan was able to pass him and finish the race. After the race, Crisler walked by Buchanan and brushed her arm with his arm. On July 31, 2016, Buchanan saw Crisler at another running race. Crisler did not approach Buchanan, but Crisler "brushed elbows" with Buchanan's husband during the race.
During this time, Crisler's Internet postings continued, and several individuals known to Buchanan alerted her to Crisler's online postings. For instance, in June 2016, Buchanan received a telephone call from a fellow lawyer, informing her that "there was more stuff going on Facebook." In August 2016, Buchanan received an e-mail from another attorney, who informed Buchanan that Crisler had posted several messages about her on Facebook. In October 2016, a prosecutor contacted Buchanan to inform her that Crisler had posted statements about her on the Facebook page of Billie Jo O'Berry, who was, at that time, running for office. In November 2016, Buchanan also received a text message from a probation officer, telling her that there were additional postings about her by Crisler in the comments section of an online newspaper article reporting on how "little work" is done by court-appointed defense attorneys.[1]
In July 2016, Buchanan sent Crisler a cease-and-desist letter, demanding that Crisler cease and desist all defamation of Buchanan as well as all harassing or intimidating conduct. Buchanan asserted in the letter that Crisler's written statements on Facebook and his website were false and defamatory, and Buchanan requested a written retraction. Additionally, Buchanan indicated that Crisler's e-mailing her, tagging her on Facebook, and intentionally making physical contact with her in a public place were acts of "harassment and threats." Buchanan indicated that any additional attempt to contact Buchanan "via e-mail, orally or otherwise will be considered harassment and stalking."
*892 On October 15, 2016, Crisler posted the contents of Buchanan's cease-and-desist letter on Facebook. Crisler stated that, since receiving the letter, he had "not Ceased, nor Desisted, in openly publishing the truth about how [Buchanan] purposely sold me out...." Crisler also provided commentary on the letter, stating that he was "so happy" when he received the letter in July and that he was "excited at the prospect" of a lawsuit by Buchanan. Crisler indicated that he had not provided a retraction to Buchanan. He went on to deny all allegations of defamation and to again recount his list of grievances against Buchanan. Crisler also advised his readers not to hire Buchanan as an attorney, noting "[s]he may do to you what she did to me."
In November 2016, Buchanan petitioned the circuit court for an ex parte PPO. In her petition, Buchanan asserted that Crisler stalked her as defined in MCL 750.411h and MCL 750.411i by approaching or confronting her in a public place and sending her mail or other communications. Additionally, relying on MCL 750.411s, Buchanan maintained that Crisler "post[ed] a message" about her through the use of any medium of communication, including the Internet or a computer. Buchanan requested an ex parte order to prevent Crisler from engaging in these activities. On November 9, 2016, the circuit court granted Buchanan's petition and entered an ex parte order prohibiting Crisler from (1) "approaching or confronting [Buchanan] in a public place or on private property," (2) "sending [Buchanan] mail or other communications," and "(3) posting a message through the use of any medium of communication, including the Internet or a computer...."
On November 21, 2016, Crisler moved to terminate the PPO. A hearing on Crisler's motion was held on January 30, 2017, and March 15, 2017. In seeking the termination of the PPO, Crisler maintained that his postings about Buchanan's asserted misconduct in representing him during his criminal trial were true. Crisler maintained that he had a First Amendment right to post the truth about what happened in his criminal case. On the basis of his contention that his online speech was constitutionally protected, Crisler maintained that under MCL 750.411s(6) his postings could not be enjoined. In support of his argument, Crisler attempted to introduce evidence and testimony relating to the truth of his Internet postings. However, the trial court excluded this evidence, concluding that it was irrelevant, for purposes of MCL 750.411s, whether the posts were true.
Following the hearing, the trial court issued a written opinion and order denying Crisler's motion to terminate the PPO. Relying on MCL 750.411h(1), MCL 750.411i(1), and MCL 750.411s(1), the trial court determined that Crisler stalked Buchanan and that Buchanan was entitled to a PPO under MCL 600.2950a(1). The trial court explained:
The testimony and evidence in this case show [Crisler] engaged in a pattern and course of unconsented contact and conduct by his continuing internet postings relating to his allegations about the quality of [Buchanan's] legal representation, which contact and conduct continued up to the date [Buchanan] filed her request for a personal protection order.
In accordance with the broad scope of the definition of "credible threat", the words and actions undertaken by [Crisler] caused [Buchanan] to reasonably fear for her safety. That [Crisler] may not have intended to threaten, intimidate or harass Buchanan is of no consequence since the focus of the personal protection order statute and the stalking *893 statutes is on the perception of the victim.
The unpleasant and continuing nature of [Crisler's] conduct and words caused distress for [Buchanan] and caused to [sic] her to feel harassed and intimidated.
[Buchanan] actually suffered emotional distress as a result of the harassment perpetrated by [Crisler].
[Crisler] stalked [Buchanan] within the meaning of the applicable statutes.
The trial court also more specifically addressed Crisler's First Amendment arguments relating to his Internet postings. The trial court recognized that under MCL 750.411s(6), a PPO cannot be used to prohibit constitutionally protected speech. However, referring to definitions from lay Internet sources, the trial court determined that Crisler had engaged in "cyberbullying" and "Facebook stalking." The trial court concluded that Crisler's posts were not constitutionally protected speech because the postings "were obviously intended to harass and/or humiliate" Buchanan. Ultimately, the trial court denied Crisler's motion to terminate the PPO. Crisler now appeals as of right.
II. ANALYSIS
Crisler argues that his online postings about Buchanan are protected by the First Amendment, and Crisler contends that the trial court erred by restricting his online postings without properly considering whether Crisler's posts were protected speech. Specifically, Crisler asserts that he can prove the truthfulness of his complaints about Buchanan, and he maintains that if his posts are not defamatory, his online speech cannot be restricted because MCL 750.411s(6) prevents courts from using a PPO to restrict constitutionally protected speech. Crisler asserts that the trial court improperly excluded Crisler's evidence regarding the truthfulness of his postings, because the evidence was relevant to determining whether the postings were defamatory. Additionally, Crisler argues that in restricting Crisler's speech, the trial court failed to properly apply MCL 750.411s and erred by using lay definitions from the Internet to define "cyberbullying" and "Facebook stalking." Crisler maintains that his posts regarding the efficacy of public defenders and collusion between Buchanan, the district court judges, and the prosecution involve an important matter of public concern. According to Crisler, before restricting his speech, the trial court should have balanced the interests involved and required Buchanan to articulate a compelling reason to restrict Crisler's posts.
A. STANDARDS OF REVIEW
Issues of constitutional law, including the application of the First Amendment, are reviewed de novo. Sarkar v. Doe , 318 Mich. App. 156, 167, 897 N.W.2d 207 (2016) (quotation marks omitted). Questions of statutory interpretation are also reviewed de novo. Lear Corp v. Dep't of Treasury , 299 Mich. App. 533, 537, 831 N.W.2d 255 (2013). "A trial court's ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion." Reed v. Reed , 265 Mich. App. 131, 160, 693 N.W.2d 825 (2005). "An abuse of discretion occurs when the court's ruling is outside the range of reasonable and principled outcomes." Barr v. Farm Bureau Gen. Ins. Co. , 292 Mich. App. 456, 458, 806 N.W.2d 531 (2011).
B. OVERVIEW OF POSTING A MESSAGE UNDER MCL 750.411s
In this case, the PPO in question prevents Crisler from: (1) "approaching or confronting [Buchanan] in a public place or *894 on private property," (2) "sending mail or other communications" to Buchanan, and (3) "posting a message through the use of any medium of communication, including the Internet or a computer ...." On appeal, Crisler does not appear to challenge the restrictions placed on the first two courses of conduct, which consist of conduct aimed directly at Buchanan that implicates MCL 750.411h and MCL 750.411i.[2] The only dispute on appeal relates to whether Crisler's posting of online messages about Buchanan may be enjoined under MCL 750.411s or whether the conduct is protected by the First Amendment.
Under MCL 600.2950a(1), in nondomestic matters, an individual may petition for a PPO to enjoin, among other activities, "posting a message" contrary to MCL 750.411s. In particular, MCL 600.2950a(1) provides:
[A]n individual may petition the family division of circuit court to enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited under section 411h, 411i, or 411s of the Michigan penal code, 1931 PA 328, MCL 750.411h, 750.411i, and 750.411s. Relief under this subsection shall not be granted unless the petition alleges facts that constitute stalking as defined in section 411h or 411i, or conduct that is prohibited under section 411s, of the Michigan penal code, 1931 PA 328, MCL 750.411h, 750.411i, and 750.411s.
MCL 750.411s is a criminal statute, found in the Michigan Penal Code, which, if certain criteria are met, prohibits posting a message about an individual without that individual's consent. In relevant part, the statute states:
(1) A person shall not post a message through the use of any medium of communication, including the Internet or a computer, computer program, computer system, or computer network, or other electronic medium of communication, without the victim's consent, if all of the following apply:
(a) The person knows or has reason to know that posting the message could cause 2 or more separate noncontinuous acts of unconsented contact with the victim.
(b) Posting the message is intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested.
(c) Conduct arising from posting the message would cause a reasonable person to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.
(d) Conduct arising from posting the message causes the victim to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.
* * *
(6) This section does not prohibit constitutionally protected speech or activity.
* * *
(8) As used in this section:
* * *
*895 (g) "Emotional distress" means significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling.
* * *
(i) "Post a message" means transferring, sending, posting, publishing, disseminating, or otherwise communicating or attempting to transfer, send, post, publish, disseminate, or otherwise communicate information, whether truthful or untruthful, about the victim.
(j) "Unconsented contact" means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes any of the following:
(i ) Following or appearing within sight of the victim.
(ii ) Approaching or confronting the victim in a public place or on private property.
(iii ) Appearing at the victim's workplace or residence.
(iv ) Entering onto or remaining on property owned, leased, or occupied by the victim.
(v ) Contacting the victim by telephone.
(vi ) Sending mail or electronic communications to the victim through the use of any medium, including the internet or a computer, computer program, computer system, or computer network.
(vii ) Placing an object on, or delivering or having delivered an object to, property owned, leased, or occupied by the victim. [ MCL 750.411s.]
MCL 750.411s does not prohibit an actor from posting any and all messages of every kind. Rather, as set forth in MCL 750.411s(1)(a), posting a message about the victim through any medium of communication, without the victim's consent, is prohibited if four basic elements are met. Notably, the focus of these elements is on the conduct the actor intended to cause by posting the message and the effect of that conduct. Specifically, the first and second elements relate to the knowledge and intent of the person posting the message in terms of what conduct would result from the postings, while the third and fourth elements relate to the effect of the conduct that occurs because of the postings. That is, to violate the statute, when posting the message, the actor must know, or have reason to know, that posting the message "could cause " 2 or more separate noncontinuous acts of "unconsented contact." MCL 750.411s(1)(a) (emphasis added). Additionally, in terms of the actor's intent, posting the message must be "intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411s(1)(b) (emphasis added). Regarding the effect of this conduct on the victim, there is both an objective and subjective requirement. The conduct arising from posting the message must be such that (1) it "would cause a reasonable person to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested," MCL 750.411s(1)(c), and (2) it actually "causes the victim to suffer emotional distress and to feel terrorized, frightened, intimidated, harassed, or molested," MCL 750.411s(1)(d).
Considering these elements, it appears that the statute is designed to prohibit what some legal scholars have referred to as "cyberstalking by proxy" or "cyberharassing *896 by proxy."[3] In other words, as made plain by the statute, it is not the postings themselves that are harassing to the victim; rather, it is the unconsented contacts arising from the postings that harass the victim. In particular, the statute envisions a scenario in which a stalker posts a message about the victim, without the victim's consent, and as a result of the posting, others initiate unconsented contacts with the victim. These unconsented contacts, arising from the stalker's postings, result in the harassment of the victim. In this manner, by posting a message that leads to unconsented contact, the stalker is able to use other persons to harass the victim.
For example, there have been cases of cyberstalking by proxy in which a stalker posts messages with sexual content about the victim and suggests that the victim is interested in sexual contact. See, e.g., United States v. Sayer , 748 F.3d 425, 428 (C.A. 1, 2014).[4] In that situation, third parties read the message and contact the victim, expecting sex. See, e.g., id . See also Cutting Cyberstalking's Gordian Knot , 43 Seton Hall L. Rev. at 1009. In a somewhat more benign example, in a Massachusetts case, harassers posted false advertisements online, suggesting that the victims had something for sale or to give away for free; as a result of these advertisements, the victims received numerous phone calls and visits at their home about the items. See Commonwealth v. Johnson , 470 Mass. 300, 303-304, 21 N.E.3d 937 (2014). In each of these cases, the victim was harassed by the unconsented contacts that arose from the online postings. As written, MCL 750.411s is designed to address situations in which the victim is harassed by conduct arising from the posts.
Under MCL 600.2950a(1), an individual, who engages in stalking as defined in MCL 750.411h and MCL 750.411i or who violates MCL 750.411s, may be prohibited from posting messages that violate MCL 750.411s. However, because MCL 750.411s provides specific criteria for what it means to "post a message," the only postings that may be prohibited under MCL 750.411s are those that violate the statute. Consequently, to prohibit postings under MCL 750.411s, there must be a determination that the postings in question violate the elements set forth in the statute.
C. THE FIRST AMENDMENT
"The First Amendment of the United States Constitution provides that " 'Congress shall make no law ... abridging the freedom of speech....' " Thomas M. Cooley Law Sch. v. Doe 1 , 300 Mich. App. 245, 255-256, 833 N.W.2d 331 (2013), quoting U.S. Const., Am. I. The Michigan Constitution provides the same protection under Const. 1963, art. 1, § 5, which states that " '[e]very person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech.' " Thomas M. Cooley Law Sch. , 300 Mich. App. at 256, 833 N.W.2d 331, quoting Const. 1963, art. 1, § 5 (alteration in original). Speech over the Internet is protected "to the same extent as speech over other media...."
*897 Sarkar , 318 Mich. App. at 174, 897 N.W.2d 207 (quotation marks and citation omitted). However, the freedom of speech is not absolute, and there are "certain categories of speech" that are not protected by the First Amendment. Thomas M. Cooley Law Sch. , 300 Mich. App. at 256-257, 833 N.W.2d 331. "These historic and traditional categories long familiar to the bar-including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct-are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." United States v. Stevens , 559 U.S. 460, 468-469, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quotation marks and citations omitted).
1. DEFAMATION
In large part, Crisler's First Amendment arguments relate to defamation and the assertion that, if his postings are true, they cannot be restricted. According to Crisler, the trial court abused its discretion by refusing to admit Crisler's evidence regarding Buchanan's representation during his criminal trial. Had this evidence been considered, Crisler maintains that he could have established the truth of his postings and the trial court could not have prohibited him from publishing this truthful information. We disagree.
"A communication is defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." Ireland v. Edwards , 230 Mich. App. 607, 614, 584 N.W.2d 632 (1998). "Statements that are not protected [by the First Amendment] and therefore are actionable include false statements of fact, i.e., those that state actual facts but are objectively provable as false and direct accusations or inferences of criminal conduct." Kevorkian v. American Med. Ass'n , 237 Mich. App. 1, 8, 602 N.W.2d 233 (1999). The elements of defamation vary depending on whether the defamed individual is a public or private figure and on whether the topic is one of public concern. See Rouch v. Enquirer & News of Battle Creek (After Remand) , 440 Mich. 238, 252, 487 N.W.2d 205 (1992) ; Kevorkian , 237 Mich. App. at 9, 602 N.W.2d 233.
Although statements that are defamatory are not protected under the First Amendment, Kevorkian , 237 Mich. App. at 8, 602 N.W.2d 233, it does not follow that truth is a defense to a PPO prohibiting postings that violate MCL 750.411s. Quite simply, Crisler's defamation arguments lack merit for the simple reason that defamation is not the only type of speech exempted from First Amendment protections. And in this case, the trial court did not prohibit Crisler's speech because it had concluded that Crisler defamed Buchanan. Rather, the trial court entered a PPO to prevent Crisler from posting a message in violation of MCL 750.411s. Under MCL 750.411s(8)(i), the truthfulness of the messages is irrelevant to whether Crisler violated the statute. In these circumstances, because his speech was not restricted on the basis of a finding of defamation, Crisler's evidence regarding the truthfulness of his postings was not relevant, and it was not admissible. See MRE 401 ; MRE 402. Instead, as discussed later, regardless of whether the speech is defamatory, speech may be prohibited under the statute when it is integral to the commission of a crime.
2. SPEECH INTEGRAL TO CRIMINAL CONDUCT
Aside from his defamation arguments, Crisler maintains that the trial court failed to properly apply MCL 750.411s and that the court erred by restricting his speech based on the conclusion that Crisler had *898 engaged in "cyberbullying" and "Facebook stalking" as defined by lay dictionary sources. Crisler also contends that his speech relating to Buchanan's performance as a public defender and a conspiracy between Buchanan, the district court judges, and the prosecutor relates to a matter of significant public concern that should not be restricted absent a compelling reason. Essentially, Crisler argues that the trial court failed to make findings that would warrant the restriction of his speech as a violation of MCL 750.411s. Although Crisler does not refer to the speech-integral-to-criminal-conduct exception, in our judgment, his arguments implicate the exception.
The speech-integral-to-criminal-conduct exception has its origins in Giboney v. Empire Storage & Ice Co. , 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949). In Giboney , by picketing with placards bearing written messages, union members attempted to coerce a business into signing an illegal agreement not to do business with nonunion members. Id . at 492-493, 69 S.Ct. 684. Reasoning that the picketers' "sole, unlawful immediate objective" was to induce the business to violate the law, the Court rejected the assertion that the picketers' conduct was shielded by the First Amendment, explaining that "placards used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from state control." Id . at 502, 69 S.Ct. 684. More broadly, the Giboney Court stated that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Id . On the basis of this reasoning, courts have recognized that, for example, "there is no First Amendment protection for offers to engage in illegal transactions, offers to provide or requests to obtain unlawful material, and speech in furtherance of a conspiracy." United States v. Matusiewicz , 84 F.Supp.3d 363, 369 (D. Del., 2015) (quotation marks and citation omitted).
Relevant to this case, several courts have also relied on the speech-integral-to-criminal-conduct exception in rejecting First Amendment challenges to stalking statutes, including cyberstalking statutes. See, e.g., Sayer , 748 F.3d at 433-434 ; United States v. Petrovic , 701 F.3d 849, 855 (C.A. 8, 2012) ; United States v. Osinger , 753 F.3d 939, 947-948 (C.A. 9, 2014) ; Matusiewicz , 84 F.Supp.3d at 372-373 ; Johnson , 470 Mass. at 310, 21 N.E.3d 937 ; United States v. Sergentakis , opinion of the United States District Court for the Southern District of New York, issued June 15, 2015 (Case No. 15-cr-33 (NSR) ), p 7, 2015 WL 3763988. See also People v. White , 212 Mich. App. 298, 311, 536 N.W.2d 876 (1995) (rejecting a free-speech challenge to MCL 750.411h and MCL 750.411i because stalking involved a course of conduct consisting of speech combined with conduct). "The government has a strong and legitimate interest in preventing the harassment of individuals." Thorne v. Bailey , 846 F.2d 241, 243 (C.A. 4, 1988). See also United States v. Lampley , 573 F.2d 783, 787 (C.A. 3, 1978) ("Congress had a compelling interest in the protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives."). And when the government enacts laws to prevent these types of harassment, any expressive aspects of speech are not protected under the First Amendment when the speech, as an integral part of criminal conduct, serves solely to implement the stalker's criminal purpose in intentionally harassing the victim.
*899 See Sayer , 748 F.3d at 434 ; Osinger , 753 F.3d at 947.
Similarly, in our judgment, posting a message in violation of MCL 750.411s would not constitute protected speech because the message is integral to the harassment of the victim insofar as it leads to, and is intended to cause, unconsented contacts that terrorize, frighten, intimidate, threaten, harass, or molest the victim. Analogously to the picketers in Giboney , an individual posting a message in violation of MCL 750.411s acts with the unlawful objective to induce a criminal course of conduct by prompting others to engage in unconsented contacts with the victim that amount to harassment. While there may generally be a right to express one's views online, no one has the right to intentionally lead others to engage in unconsented contacts that amount to harassment. See State v. Carpenter , 171 P.3d 41, 58 (Alas., 2007) (finding that under the First Amendment, a radio personality could ridicule local critics on-air but that he could not call on listeners to engage in harassment). Generally speaking, because posting a message in violation of MCL 750.411s constitutes speech integral to criminal conduct, the message is not protected.
However, we note that courts and scholars have cautioned against applying Giboney 's speech-integral-to-criminal-conduct exception too broadly, particularly in the context of harassment provisions. "Under the broadest interpretation, if the government criminalized any type of speech, then anyone engaging in that speech could be punished because the speech would automatically be integral to committing the offense." Matusiewicz , 84 F.Supp.3d at 369. Indeed, read broadly, statutes regarding "criminal harassment would curb speech ranging from a person submitting a Facebook post excoriating an ex-lover for cheating, to the creation of offensive political flyers criticizing a city council member." State v. Burkert , 444 N.J. Super. 591, 602, 135 A.3d 150 (App. Div., 2016). Particular concern is often expressed over harassment laws that could be used to prohibit public discourse about public figures and public concerns:
Under [the speech integral to criminal conduct] rationale, any repeated online speech-including public political ridicule of politicians, journalists, businesspeople, religious figures, and others-that intentionally causes substantial emotional distress would be constitutionally unprotected.
After all, many political attacks, especially if they are successful in revealing their target's misdeeds, can inflict substantial emotional distress. The loss of a place of honor, or even the prospect of such a loss, is naturally extremely distressing. So is the sense that hundreds of thousands of people are being persuaded to view you with contempt.
And many of the most effective attacks come from people who have long been the target's enemy, whether those people are politicians who have fought with the target, or journalists or activists who have long viewed the target as dishonest or evil. Those speakers may well be seen as speaking with the intent of substantially distressing the target (likely intertwined with other motivations). Under the terms of the federal statute, there is nothing to keep this statute from covering such "conduct" in the form of repeated public ridicule, release of damaging facts about the target, and the like. [Volokh, The "Speech Integral To Criminal Conduct" Exception , 101 Cornell L. Rev. 981, 1040-1041 (2016).]
These same concerns hold true for Michigan's cyberstalking statute. For instance, *900 if someone has the intent to harass and cause emotional distress to a politician or other public figure, online postings disparaging the politician's viewpoint and encouraging people to contact the person in question could be criminalized under MCL 750.411s if the unconsented contacts result in the politician feeling harassed. Of course, MCL 750.411s(6) provides that the statute does not prohibit constitutionally protected speech. But this provision merely begs the question of how it should be determined whether speech integral to violating MCL 750.411s is protected.
Faced with similar concerns, courts analyzing First Amendment challenges relating to online postings and harassment often use a case-specific approach to determine whether the speech-integral-to-criminal-conduct exception may be applied. In particular, analogously to the defamation context, this analysis often hinges on whether the victim is a public or private figure and whether the topic is one of public concern. For example, in United States v. Cassidy , 814 F.Supp.2d 574, 583 (D. Md., 2011), the court determined that a cyberstalking statute was unconstitutional as applied when the alleged stalker used Twitter and a blog to harass a well-known Buddhist religious leader. In reaching this conclusion, the court repeatedly emphasized that the victim was a public figure and that the content of the posts-which included attacks on her character and qualifications as a religious leader-were matters of public concern. Id . at 583, 586. In contrast to Cassidy , in cases such as Sayer , Petrovic , and Osinger , which concluded that online postings amounted to cyberstalking and not protected speech, the stalkers posted purely private information-specifically highly personal sexual content-about private individuals. Osinger , 753 F.3d at 948 ; Petrovic , 701 F.3d at 855-856 ; Sayer , 748 F.3d at 428. When these various cases are read together, it becomes clear that while messages posted to harass a private individual may be enjoined, cyberstalking laws may not be used to restrict speech that relates to a public figure or matters of public concern. See Matusiewicz , 84 F.Supp.3d at 371-372 ; Sergentakis , unpub. op. at 4. We find these cases persuasive, and we hold that when the argument is raised that MCL 750.411s is being used to prohibit constitutionally protected speech relating to a matter of public concern, it must be determined whether the postings are intended solely to cause conduct that will harass a private victim in connection with a private matter or whether the publication of the information relates to a public figure and an important public concern.[5] See Matusiewicz , 84 F.Supp.3d at 371-372 ; Sergentakis , unpub. op. at 4-7.
Relevant to this analysis, the First Amendment affords the highest protection to public speech about public figures. Locricchio v. Evening News Ass'n , 438 Mich. 84, 118, 476 N.W.2d 112 (1991). With regard to distinguishing between *901 public and private figures, a public figure is someone "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures...." Gertz v. Robert Welch, Inc. , 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). There are two kinds of public figures: a "limited-purpose" public figure, who voluntarily injects himself into a specific public controversy and who is a public figure with respect to limited issues, and a "general-purpose" public figure, "who attains such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP , 759 F.3d 522, 527 (C.A. 6, 2014) (quotation marks and citation omitted). Public-figure status must exist before information about the person is disclosed to the public and not because of the notoriety arising because such information is made public. Hodgins Kennels, Inc. v. Durbin , 170 Mich. App. 474, 483, 429 N.W.2d 189 (1988), rev'd in part on other grounds 432 Mich. 894, 438 N.W.2d 247 (1989).
In terms of public versus private concerns, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Snyder v. Phelps , 562 U.S. 443, 452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (quotation marks and citation omitted). In comparison, "where matters of purely private significance are at issue, First Amendment protections are often less rigorous." Id . The "boundaries of the public concern test are not well defined"; but there are "some guiding principles" that apply to help distinguish public concern from private matters. Id . (quotation marks and citation omitted). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Id . at 453, 131 S.Ct. 1207 (quotation marks and citations omitted). In addition to content, to determine whether the speech deals with a matter of public concern, it is also necessary to consider the form and context of the postings. Id . at 454, 131 S.Ct. 1207. "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." Id . When content is considered along with the form and context of the messages, it will become apparent whether postings involve a matter of public concern or whether the postings are a thinly veiled attempt to immunize a private harassment campaign as a matter of public concern.[6] See, e.g., Sergentakis , unpub. op. at 4-7.
In sum, to enjoin an individual from posting a message in violation of MCL 750.411s, there must first be a finding that a prior posting violates that statute. This inquiry requires the trial court to make a factual determination regarding the elements of MCL 750.411s, focusing on the actor's intent in posting the message and the effect of the conduct arising from the message. If it is determined that the actor has violated MCL 750.411s, the trial court should then consider the nature of the postings that will be restricted to ensure that constitutionally protected speech will not be inhibited by enjoining an individual's *902 online postings.[7] MCL 750.411s(6). While the government has an interest in preventing the harassment of private individuals in relation to private matters, MCL 750.411s may not be employed to prevent speech relating to public figures on matters of public concern. Consequently, when it is asserted that the postings involve a matter of public concern, the court must consider the content, form, and context of the online postings to determine whether they involve constitutionally protected speech on a matter of public concern. If the court determines that constitutionally protected speech will not be inhibited, posting a message in violation of MCL 750.411s may be enjoined under MCL 600.2950a(1).
D. APPLICATION
Turning to the facts of this case, we agree with Crisler that the trial court failed to make appropriate findings to warrant the restriction of his online postings as a violation of MCL 750.411s. Consequently, we vacate the trial court's order to the extent it implicates Crisler's online postings, and we remand for a determination of whether Crisler's posts violated MCL 750.411s(1).[8] If the trial court concludes that Crisler violated MCL 750.411s, the court should also consider whether Crisler was engaged in constitutionally protected speech involving a matter of public concern that may not be prohibited under MCL 750.411s(6).
As we have discussed, MCL 750.411s criminalizes posting a message in certain circumstances, and to the extent this posting involves speech, that speech may be restricted via a PPO under MCL 600.2950a(1). However, this restriction of speech integral to criminal conduct is only appropriate when the postings in question violate MCL 750.411s. In the present case, the trial court failed to make findings that would warrant this restriction.
Relevant to MCL 750.411s, Crisler posted messages about Buchanan on his Facebook page, his website, and in the comments sections of news articles. The comments consisted of Crisler's complaints regarding the quality of Buchanan's representation in 2011, including allegations of unethical conduct, collusion with the prosecutor and trial judges, and more general complaints relating to her purportedly deficient performance as counsel. He also tagged her on Facebook, thereby posting a link to Buchanan's Facebook *903 page. Crisler's comments were clearly posted on the Internet without Buchanan's consent. MCL 750.411s(1). Further, while there is no indication that Crisler encouraged people to contact Buchanan (indeed, he encouraged people not to consult her as an attorney), Buchanan did receive several contacts relating to the postings. In 2012, she was contacted by strangers-Scally and Grashow-informing her of Crisler's postings about her. In 2016, she was also contacted by professional colleagues, who informed her that Crisler had posted about her online. Additionally, because Crisler "tagged" her on Facebook in 2015, Facebook sent Buchanan a message informing her that she had been tagged.
However, when considering whether Crisler's online comments should be enjoined for posting a message in violation of MCL 750.411s, the trial court wholly failed to consider the elements for posting a message in violation of MCL 750.411s. First of all, rather than focusing on the plain language of MCL 750.411s, the trial court turned to lay sources on the Internet to conclude that Crisler had engaged in "cyberbullying" and "Facebook stalking."[9] Neither of these definitions appear in MCL 750.411s, and there is no basis for turning to these definitions instead of applying the statutory criteria to determine whether Crisler posted a message in violation of MCL 750.411s. Second, in finding that the postings were intended to harass Buchanan, the trial court erred by focusing on the effect of Crisler's postings on Buchanan when, as discussed, MCL 750.411s criminalizes cyberstalking by proxy, meaning that the focus should be on the effect of the conduct arising from Crisler's postings. In other words, if Crisler's postings led people to contact Buchanan and if those contacts can be considered unconsented, the correct inquiry for determining whether Crisler's posts violated MCL 750.411s is how the contacts from Scally, Grashow, Facebook, and Buchanan's professional colleagues made Buchanan feel and how a reasonable person would feel after receiving those contacts.[10] See MCL 750.411s(1)(c) and (d). By instead focusing on how the content of Crisler's postings made Buchanan feel, the trial court failed to correctly consider the elements of the statute.
Third, the trial court expressly stated that, even if Crisler may not have intended to threaten, intimidate, or harass Buchanan, it was of no consequence "since the focus of the personal protection order statute and the stalking statutes is on the perception of the victim." To the extent that the trial court intended for this finding to apply to MCL 750.411s, the trial court ignored the clear directives in the statute. Specifically, MCL 750.411s(1)(b) makes plain that, to have posted a message in violation of MCL 750.411s, Crisler must have "intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, *904 or molested." (Emphasis added.) Contrary to the trial court's statement, Crisler's intent is relevant under MCL 750.411s. The trial court therefore erred by failing to determine whether by posting the messages Crisler intended to cause conduct that would meet the criteria of MCL 750.411s. The trial court also failed to decide whether Crisler knew or should have known that his posts could cause unconsented contacts. Overall, while prohibiting Crisler from posting messages about Buchanan online, the trial court did not make findings that support the conclusion that Crisler's postings amounted to a violation of MCL 750.411s.
Absent appropriate findings under MCL 750.411s, it is not clear whether Crisler violated MCL 750.411s or whether his Internet postings could be prohibited under the statute. The trial court's failure to address the elements of MCL 750.411s before restricting Crisler's postings is particularly troubling because whether his online speech may be enjoined as a constitutional matter depends, at least in part, on whether his speech was integral to criminal conduct that violated MCL 750.411s. In short, until the trial court makes findings that support the conclusion that Crisler violated MCL 750.411s, it was improper to use the statute as a basis to restrict Crisler's Internet postings. In light of the trial court's failure to address whether Crisler's postings violated MCL 750.411s, we vacate the trial court's order regarding Internet postings and remand for a determination of whether Crisler's postings violated MCL 750.411s. If the trial court concludes that Crisler violated MCL 750.411s, before restricting Crisler's speech, the court should also consider Crisler's argument that he was engaged in constitutionally protected speech involving a matter of public concern that may not be prohibited under MCL 750.411s(6).
We affirm the trial court's denial of Crisler's motion to vacate the PPO insofar as the PPO prohibits Crisler from approaching Buchanan and sending her messages directly. However, we vacate the trial court's order to the extent it relates to Crisler's online postings, and we remand for proceedings consistent with this opinion. We do not retain jurisdiction.
Cavanagh, P.J., and Beckering, J., concurred with Hoekstra, J.

Aside from the e-mail contacts from Scally and Grashow in 2012, Buchanan personally knew all the other individuals-i.e., the lawyers and the probation officer-who contacted her about Crisler's posts.

Both MCL 750.411h(1)(d) and MCL 750.411i(1)(e) prohibit "stalking," which the statutes define as a "willful course of conduct involving repeated or continuing harassment...." The term "harassment" refers to "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact...." MCL 750.411h(1)(c) and MCL 750.411i(1)(d). In both statutes, the term "unconsented contact" includes "[s]ending mail or electronic communications to th[e] individual" and "approaching or confronting th[e] individual in a public place or on private property." MCL 750.411h(1)(e)(ii ) and (vi ) ; MCL 750.411i(1)(f)(ii ) and (vi ).

See House Legislative Analysis, HB 6052 (October 4, 2000). See also O'Connor, Cutting Cyberstalking's Gordian Knot: A Simple and Unified Statutory Approach , 43 Seton Hall L. Rev. 1007, 1009, 1013 (2013) ; Fukuchi, A Balance of Convenience: The Use of Burden-Shifting Devices in Criminal Cyberharassment Law , 52 B. C. L. Rev. 289, 293-294 (2011).

Although not binding, lower federal court decisions may be considered persuasive. Abela v. Gen. Motors Corp. , 469 Mich. 603, 607, 677 N.W.2d 325 (2004).

As noted, there are other types of speech that are not constitutionally protected, and these types of speech could also be restricted under MCL 750.411s without raising constitutional concerns. For instance, there is no constitutional protection for "true threats," meaning "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Virginia v. Black , 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). While the true-threat exception could potentially have application in the PPO context, in this case, Crisler's statements did not contain threats of violence. Likewise, defamation could potentially arise in an action involving cyberstalking, and that type of defamatory speech would not be protected. See, e.g., Matusiewicz , 84 F.Supp.3d at 371-372. But as discussed, this case did not involve a determination that Crisler defamed Buchanan.

For example, with regard to context, an important consideration may be whether, aside from the online postings, the individual has undertaken other actions to harass the victim. See Osinger , 753 F.3d at 953 (Watford, J., concurring); Sergentakis , unpub. op. at 4-7.

See generally Dennis v. United States , 341 U.S. 494, 513, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (opinion by Vinson, C.J.) ("When facts are found that establish the violation of a statute, the protection ... afforded by the First Amendment is a matter of law.").

On appeal, Crisler also argues that the trial court abused its discretion by admitting samples of his Internet postings without considering whether Buchanan authenticated the documents within the meaning of MRE 901. Crisler objected on this basis at the hearing. However, rather than consider the admissibility of the documents under MRE 901, the trial court admitted the documents on the basis of the court's conclusion that a "somewhat relaxed" version of the rules of evidence applied. We see no reason why the rules of evidence would not apply. See MRE 101 ; MRE 1101. And we agree that the trial court abused its discretion by admitting the documents in question without ruling on Crisler's authentication objection under MRE 901. Nevertheless, any error in this regard does not entitle Crisler to relief on appeal because, in addition to other indications that the posts were written by Crisler, Crisler fully admitted at the hearing that he had posted complaints about Buchanan's representation of him on his website and Facebook page. Consequently, Crisler is not entitled to relief on the basis of the trial court's failure to address Crisler's objection under MRE 901. See Landin v. Healthsource Saginaw, Inc. , 305 Mich. App. 519, 541, 854 N.W.2d 152 (2014) ; MRE 103(a) ; MCR 2.613(A).

Specifically, citing information found on the website stopbullying.gov, the trial court defined "cyberbullying" as "bullying that takes place using electronic technology. Examples of cyberbullying include mean text messages or emails, rumors sent by email or posted on social networking sites, and embarrassing pictures, videos, websites, or fake profiles." (Quotation marks omitted.) Likewise, relying on information found on the website nobullying.com, the trial court defined Facebook stalking as "attempting to humiliate [a victim] by posting mean-spirited, offensive, personal, or doctored photos of [the victim] on Facebook, or anywhere online." (Quotation marks omitted; alteration in original.)

Related to this inquiry, the trial court also failed to address whether the contacts were "unconsented contacts" as defined in MCL 750.411s(8)(j).