*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SF,

Petitioner-Appellee,

v

EB,

Respondent-Appellant.

UNPUBLISHED
June 16, 2025
9:55 AM

No. 367196
Clinton Circuit Court
Family Division
LC No. 23-031274-PH

Before: BORRELLO, P.J., and REDFORD and PATEL, JJ.

REDFORD, J. (*dissenting*).

Because I conclude that, under the unique facts and circumstances of this case, petitioner was a public official and the activities undertaken by respondent were protected activities under the United States Constitution and the Constitution of the State of Michigan, I would reverse the trial court's order modifying an ex parte personal protection order (PPO) against respondent. As a result, and for the reasons more fully stated below, I respectfully dissent.

## I. BACKGROUND

Petitioner was employed as an internal affairs investigator for the Michigan Department of Corrections (MDOC). On its website, the MDOC states, "Our mission is to create a safer Michigan through effective offender management and supervision in our facilities and communities while holding offenders accountable and promoting their rehabilitation."[1] The MDOC website further states, "The Internal Affairs Section in the Office of Executive Affairs [] oversees the

---

[1] Michigan Department of Corrections, *Policy Directive No. 01.01.100* (December 5, 2011), available at <https://www.michigan.gov/corrections/-/media/Project/Websites/corrections/Files/Policy-Directives/PDs-01-Administration-and-Organization/PD-0101-Organization-and-Responsibility/01-01-100-Mission-Statement.pdf?rev=fb579892ce264aa89389145ededb7782>.

Administrative Investigation process within the Michigan Department of Corrections . . . ."[2] Regarding Internal Affairs scope of authority, the website states: "Internal Affairs has jurisdiction to investigate or assist in any Departmental investigation, including all allegations of employee, contractor, and offender misconduct."[3]

Respondent was a corrections officer for the MDOC. On his personal Facebook page, he posted two internal videos from his facility, both showing a prisoner suddenly punching him. He expressed happiness that some coworkers checked on him but complained that the director, warden, and assistant deputy warden did not; he speculated it might be because they viewed him as a disgruntled, malicious, or reputation-damaging employee. Following that post, the MDOC issued a social media policy directive that effectively prohibited employees from disparaging the MDOC or its staff and posting "information concerning official business" or "information obtained through their professional duties and responsibilities." After the MDOC introduced the policy, respondent reposted the internal videos on Facebook.

After respondent reposted the videos, petitioner investigated respondent's social media activity. Petitioner, respondent, and respondent's union representative participated in an interview regarding respondent's social media activity, which respondent audio recorded. Following the interview, respondent filed a federal lawsuit against petitioner and posted the recording of the interview on YouTube. Respondent was issued a "stop order," which he promptly posted on Facebook.[4] Further online posts were made as discussed in the majority's opinion.

In 2023, petitioner was apprehended and subsequently charged with felonious criminal activity. His charges included running a prostitution business.[5] Respondent attended a pretrial hearing in that criminal case to document the proceedings and disseminate the information on Facebook. All recordings of petitioner by respondent were in a public building, or on the publicly available grounds of the public buildings on a date that petitioner was appearing to answer publicly filed criminal charges against petitioner.

The day after respondent shared the video of petitioner's courthouse arrival, petitioner filed an ex parte petition for a PPO, outlining respondent's Facebook posts and his observations regarding respondent's presence at the pretrial hearing. In turn, respondent sought to nullify the

---

[2] Michigan Department of Corrections, *Policy Directive No. 01.01.140* (August 8, 2022), p 1, available at <https://www.michigan.gov/corrections/-/media/Project/Websites/corrections/Files/Policy-Directives/PDs-01-Administration-and-Organization/PD-0101-Organization-and-Responsibility/01-01-140-Internal-Affairs-effective-07-01-18.pdf?rev=3b55ed78262c4bd6bb9748482d3fc27d>.

[3] *Policy Directive No. 01.01.140*, at p 2.

[4] A "Stop Order" is "[a] notice that is posted at a worksite prohibiting an employee or contractor from entering, or being allowed on the grounds of, an MDOC worksite." *Policy Directive No. 01.01.140*, at p 1.

[5] Petitioner later entered a guilty plea in those criminal proceedings.

PPO, impose sanctions on petitioner, and issue a subpoena to the courthouse for surveillance video footage he argued would undermine petitioner's credibility.

As addressed by the majority, respondent argued he engaged in activities protected by the Constitution. While the trial court partially agreed with respondent's view, concluding that the original PPO contained several provisions that were either improper or excessive and the trial court acknowledged respondent's right to attend public court hearings, it found that respondent had "crossed over that line in some respects" and had engaged in harassing and intimidating behavior. As a result, the trial court extended, albeit in a modified format, the PPO taken out by petitioner.

In so concluding the court stated:

I – I understand that case law with regard to constitutionally protected speech; however, I am concerned that [respondent] has crossed over that line in some respects and as I indicated initiated two federal lawsuits against this – this petitioner and some of the activities I do find harassing and intimidating. I think the conduct at the courthouse, sitting at a small table with the petitioner, I think waiting outside the courtroom for the petitioner to leave when the petitioner made a clear effort to let [respondent] clear the area.

* * *

His right to attend a public hearing doesn't give him a right – to confront or approach him and in his lawsuits, he has counsel. So, he doesn't need to be approaching or confronting the petitioner at those times.

Because I conclude petitioner was a public official and the conduct engaged by respondent was protected under the United States Constitution, I would reverse the decision of the trial court.[6]

## II. STANDARD OF REVIEW

This Court reviews for an abuse of discretion a trial court's decision to issue a PPO, but reviews for clear error the trial court's underlying factual findings. *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). A trial court abuses its discretion when the decision resulted in an outcome falling outside the range of principled outcomes. *Id*. A trial court necessarily abuses its discretion when it makes an error of law. *Berryman v Mackey*, 327 Mich App 711, 717; 935 NW2d 94 (2019). This Court defers to the trial court's factual findings and finds clear error only if it is left with a definite and firm conviction that a mistake has been made. *Hayford*, 279 Mich App at 325. This Court reviews de novo constitutional issues, including application of the First

---

[6] I agree with the majority's conclusion that respondent was not prejudiced by the trial court's errors of failing to hold a hearing within 14 days of respondent's timely motion to terminate the ex parte PPO and failing to address respondent's motion to subpoena surveillance footage. While I disagree with the majority's analysis underlying the trial court's failure to address respondent's motion for sanctions, I would likewise conclude that respondent was not prejudiced by this failure.

Amendment.  *Buchanan v Crisler*, 323 Mich App 163, 175; 922 NW2d 886 (2018).  This Court also reviews de novo questions of statutory interpretation.  *Hayford*, 279 Mich App at 325.

## III.  CONSTITUTIONALLY-PROTECTED SPEECH

Respondent's position is that the amended PPO violated the First Amendment because his conduct never exceeded the bounds of constitutionally-protected activities and, consequently, cannot constitute harassment for purposes of a PPO.  I agree.

This appeal concerns a nondomestic PPO issued under MCL 600.2950a, which allows "an independent action to obtain . . . a [PPO] to restrain or enjoin an individual from engaging in conduct that is prohibited under . . . MCL 750.411h, 750.441i, and 750.411s."  To obtain a PPO, the petition must "allege[] facts that constitute stalking as defined in section 411h or 411i, or conduct that is prohibited under section 411s, of the Michigan penal code . . . ."  MCL 600.2950a(1).  In a motion to terminate or modify an ex parte PPO, the petitioner bears the burden of persuasion.  *TM v MZ (On Remand)*, 326 Mich App 227, 236; 926 NW2d 900 (2018).

Conduct prohibited under MCL 750.411h includes "harassment," which "means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress."  MCL 750.411h(1)(d)  However, conduct that is constitutionally protected is exempted from the scope of harassment that can constitute stalking.  *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 723; 691 NW2d 1 (2005); see also MCL 750.411h(1)(d).

In this case, respondent asserts that the PPO was invalid because it was issued on the basis of him participating in a constitutionally-protected activity.  He contends that the constitutionally-protected activity was following and recording a public figure attending his arraignment on felony charges for later publication.

A person has a right to freedom of speech under both federal and Michigan constitutions.  US Const, Am I; Const 1963, art 1, § 5.[7]  However, "a person's right to free speech must be understood in light of another person's interest in being left alone."  *ARM v KJL*, 342 Mich App 283, 299; 995 NW2d 361 (2022).  With this said, the First Amendment "accord[s] maximum protection to public speech about public figures."  *Locricchio v Evening News Ass'n*, 438 Mich 84, 118; 476 NW2d 112 (1991).

When a respondent in a PPO proceeding argues that the PPO prohibits "constitutionally protected speech relating to a matter of public concern, it must be determined whether the postings are intended solely to cause conduct that will harass a private victim in connection with a private matter or whether the publication of the information relates to a public figure and an important

---

[7] Because the rights to free speech under the Michigan and federal constitutions are coterminous, "federal authority construing the First Amendment may be used in construing Michigan's constitutional free speech rights."  *City of Owosso v Pouillon*, 254 Mich App 210, 213-214; 657 NW2d 538 (2002).

public concern." *Buchanan* , 323 Mich App at 188-189.  In the context of defamation, a qualified constitutional privilege extends to defamatory statements made about public officials.  *Tomkiewicz v Detroit News, Inc*, 246 Mich App 662, 667-668; 635 NW2d 36 (2001).  Analogous to the defamation context, this Court's analysis requires a determination whether petitioner was a public official.

As noted by the majority, not every public employee is a public official.  *Id*. at 669.  The United States Supreme Court has delineated the minimum threshold for a public employee to be considered a public official: "[T]he public official designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs."  *Rosenblatt v Baer*, 383 US 75, 85; 86 S Ct 669; 15 L Ed 2d 597 (1966) (quotation marks omitted).  The Court further elaborated the employee's position must have "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees . . . ."  *Id*. at 86.  Finally, the Court noted, the employee's position must be one that would invite public scrutiny and discussion of the person holding it, separate from the scrutiny and discussion occasioned by the charge in controversy.  *Id*. at 86 n 13.

This Court has since applied *Rosenblatt* to conclude that a police lieutenant employed by a municipal police department was a public official.  *Tomkiewicz*, 246 Mich App at 671.  This Court noted that police officers are afforded significant authority and control over the daily lives of other citizens.  *Id*.  This Court also adopted the reasoning the Illinois Supreme Court applied to low-ranking law enforcement officers:

> It is our opinion that the plaintiff is within the "public official" classification.  Although as a patrolman he is "the lowest in rank of police officials" and would have slight voice in setting departmental policies, his duties are peculiarly "governmental" in character and highly charged with the public interest.  It is indisputable that law enforcement is a primary function of local government and that the public has a far greater interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an "on the street" level than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions.  The abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws.  [*Id*., quoting *Coursey v Greater Niles Twp Publishing Corp*, 40 Ill 2d 257, 264–265, 239 NE2d 837 (1968).]

Applying this analysis, petitioner was a public official.  He did not need to be responsible for setting public policy to fall within the scope of a public official.  Petitioner was an investigator in the internal affairs of a department of state government that has the statutory and constitutional duty to, among other things, incarcerate persons following trial for terms of years, sometimes including life with no possibility of parole.  The department holds significant governmental authority over the supervision and detention of incarcerated persons.  The duties of this department are unquestionably important and exclusively governmental functions.

The internal affairs investigator, when fulfilling his or her duties to "investigate or assist in any Departmental investigation, including all allegations of employee, contractor, and offender misconduct," performs an essential and important governmental function. Petitioner himself testified that, in his role as an internal affairs investigator, he was responsible for investigating prisoner conduct and employee conduct, including the perpetration of criminal acts. These duties may not affect every citizen's life on a daily basis; however, to the segment of the population who are subject to his authority, the internal affairs investigator holds significant governmental authority to investigate and accuse individuals of wrongful and even criminal conduct. Like patrolmen, the opportunity to exploit this position could have great potential for societal harm that is distinct from other low-ranking government employees. As such, the general public would have a heightened interest in the qualifications and conduct of an internal affairs investigator.

Likewise, I disagree with the majority's conclusion that any constitutional right to attend trials does not extend to pretrial proceedings. The majority relies on the plurality decision in *Richmond Newspapers v Virginia*, 448 US 555, 563-564; 573-574; 100 S Ct 2814; 65 L Ed 2d 973 (1980) (opinion by BURGER, CJ.), for the proposition that the public has a constitutional right to attend criminal trials, but it has no analogous right to attend pretrial proceedings. It likewise cites our Supreme Court's decision in *In re Midland Publishing Co, Inc*, 420 Mich 148, 160-174; 362 NW2d 580 (1984), for the proposition that there is a longstanding common-law and statutory right to attend courtroom proceedings, but there is no constitutional right to attend pretrial proceedings.

Contrary to the majority, I do not read the plurality decision in *Richmond Newspapers, Inc*, to make any holding that there is no analogous constitutional right to attend pretrial proceedings. In *Richmond Newspapers, Inc*, the Supreme Court noted its previous decision in *Gannett Co v DePasquale*, 443 US 368, 374-375; 99 S Ct 2898; 61 L Ed 2d 608 (1979), which involved a pretrial hearing on a motion to suppress certain evidence. In *Gannett*, 443 US at 391, 392 n 24, the Supreme Court held that the Sixth and Fourteenth Amendments' guarantee of a public trial to the accused did not give the public or press an enforceable right of access to a pretrial suppression hearing; however, the Court declined to decide whether the First and Fourteenth Amendments guaranteed a right for the public to attend trials. In *Richmond*, the plurality answered the question left open by *Gannett* as related to criminal trials by concluding the First and Fourteenth Amendment did provide a qualified right to the public to attend criminal trials. *Richmond Newspapers, Inc*, 448 US at 580. *Richmond* involved access to a criminal trial and the plurality made no determination regarding the right to attend pretrial proceedings.

After *Richmond Newspapers, Inc*, our Supreme Court upheld the constitutionality of MCL 750.520k, which implicitly required, that upon request, a preliminary examination would be closed to the public. *In re Midland Publishing Co, Inc*, 420 Mich at 175. The Supreme Court concluded the public had no federal or state constitutional right to access preliminary examinations. *Id*. at 172-173. In support of its conclusion, the Court relied on the Fifth Amendment's reference to the "presentment or indictment of a Grand Jury" and noted that since grand-jury proceedings were historically conducted in the absence of the public, there was no precedent for the United States

Supreme Court to extend the public's First Amendment right to access to probable cause determinations. *Id*. at 173-174.[8]

A subsequent decision of the United States Supreme Court has cast doubt on the validity of *Midland*. In *Press-Enterprise Co v Superior Court of Cal for Riverside Co*, 478 US 1, 11-13; 106 S Ct 2735; 92 L Ed 2d 1 (1986) (*Press-Enterprise II*), the United States Supreme Court held that a First Amendment right of access was not limited to the criminal trial itself, but encompassed preliminary hearings in California. In reaching this conclusion, the United States Supreme Court emphasized two considerations. *Id*. at 8. The first consideration was whether the place and process of the criminal proceeding at issue was historically open to the press and general public. *Id*. The second consideration was whether "public access play[ed] a significant positive role in the functioning of the particular process in question." *Id*. If both considerations are answered in the affirmative for the particular criminal proceeding, a qualified right of access applied to the proceeding. *Id*. at 9. The Court clarified that this right is not absolute; a trial court may close a criminal proceeding after making a specific finding "that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. (quotation marks and citation omitted).[9]

Thereafter, in *Booth Newspapers, Inc v Twelfth Dist Court Judge*, 172 Mich App 688, 693-695; 432 NW2d 400 (1988),[10] this Court, recognizing the decision in *Press-Enterprise II* and noting that preliminary examinations in Michigan are conducted in a substantially similar manner to preliminary examinations in California, held that there was a qualified First Amendment right of access applied to preliminary examinations in Michigan. Consequently, this Court concluded that MCL 750.520k was unconstitutional on its face. *Id*.

Applying the considerations in *Press-Enterprise II*, I would conclude that the qualified First Amendment right of access extends to the pretrial hearing in this case. The pretrial hearing in this case was a district court proceeding in which petitioner waived arraignment and a preliminary examination and was bound over to circuit court for various felony charges related to running a prostitution business.

In Michigan, all court proceedings are open to the public unless otherwise provided by statute or court rule. See MCL 600.1420. Arraignments specifically are open to the public as provided by statute: "Except as otherwise provided by law, the public shall have access to the courtroom or other location, that allows them to view and hear the proceedings." MCL

---

[8] Notably, the question in *Midland* involved preliminary examinations and not all pretrial proceedings.

[9] Two years earlier in *Press-Enterprise Co v Superior Court of Cal for Riverside Co (Press-Enterprise I)*, 464 US 501, 508; 104 S Ct 819; 78 L Ed 2d 629 (1984) the Supreme Court extended the First Amendment right of access to voir dire of prospective jurors.

[10] *Booth Newspapers, Inc*, was decided before November 1, 1990, and, therefore, is considered only persuasive authority. *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012); MCR 7.215(J)(I). However, I find it persuasive for its analysis of the constitutional right of access to preliminary examinations.

767.37a(3).[11] To limit access to proceedings, trial courts must follow procedures prescribed in our court rules. MCR 8.116(D) provides:

> (1) Except as otherwise provided by statute or court rule, a court may not limit access by the public to a court proceeding unless
>
> (a) a party has filed a written motion that identifies the specific interest to be protected, or the court sua sponte has identified a specific interest to be protected, and the court determines that the interest outweighs the right of access;
>
> (b) the denial of access is narrowly tailored to accommodate the interest to be protected, and there is no less restrictive means to adequately and effectively protect the interest; and
>
> (c) the court states on the record the specific reasons for the decision to limit access to the proceeding.
>
> (2) Any person may file a motion to set aside an order that limits access to a court proceeding under this rule, or an objection to entry of such an order. MCR 2.119 governs the proceedings on such a motion or objection. If the court denies the motion or objection, the moving or objecting person may file an application for leave to appeal in the same manner as a party to the action.
>
> (3) Whenever the court enters an order limiting access to a proceeding that otherwise would be public, the court must forward a copy of the order to the State Court Administrative Office.

In this matter, there is no indication that access by the public to the court proceedings related to petitioner which were attended by respondent were in any way limited or restricted.

It seems there would be little disagreement that public access, with very limited exceptions, plays a significant positive role in the functioning of the criminal justice system in this state and in our nation. At proceedings like those involved in the underlying criminal case against petitioner giving rise to the instant case, the trial court must inform the accused of the nature of the offense charged and inform the accused of various rights including the right to a preliminary examination, right to counsel, and right to pretrial release. MCR 6.610(I). The purpose of such a pretrial hearing is for the defendant to know the nature and cause of the accusations against him or her. See US Const, Am VI. As occurred in this case, this is also an opportunity for criminal defendants to make decisions that affect the remainder of the judicial process, such as waiving certain rights.

---

[11] Likewise, in *Press-Enterprise I*, the Supreme Court described an arraignment-like process occurring as early as a 1565 jury selection. 464 US at 506 ("The indictment was then read; if the accused pleaded not guilty, the jurors were called forward, one by one, at which time the defendant was allowed to make his challenges.").

Of course, the concern noted by the majority that publicity can prejudice a defendant's right to a fair trial is valid. See *Press-Enterprise I*, 464 US at 502. However, that concern must be addressed on a case-by-case basis. See *Press-Enterprise Co II*, 478 US at 15 ("The First Amendment right of access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of that right."). In this case, nothing in the record suggests that petitioner's right to a fair trial would have been infringed upon by respondent's presence at the hearing or any subsequent pretrial proceeding. Consequently, I would conclude that respondent had a qualified First Amendment right of access to the pretrial proceeding in this case and nothing overcame that qualified right.

Having concluded that petitioner was a public figure and respondent had a qualified constitutional right of access to attend the criminal proceedings involving petitioner, I turn to respondent's specific conduct in this case. Certainly, there was preexisting animosity between respondent and petitioner. However, this case involves conduct and publication of information related to a public figure and an important public concern as opposed to conduct intended solely to harass a private victim. See *Buchanan* , 323 Mich App at 188-189. Petitioner was apprehended and subsequently charged with felonious criminal activity. Respondent attended a pretrial hearing involving the aforementioned criminal case to document the proceedings and later disseminated the information on Facebook.

Publication of crimes is a matter of legitimate public concern. *Swickard v Wayne Co Med Examiner*, 438 Mich 536, 550-551; 475 NW2d 304 (1991). The criminal conduct committed by a public official is certainly a matter of legitimate public concern. Respondent followed and filmed petitioner in a public building, or on the publicly available grounds of the public building on the date that petitioner was appearing to answer publicly filed criminal charges against him for conduct he committed while employed as an internal affairs investigator for the MDOC. He did not speak to petitioner during the incident. By following petitioner and filming him, respondent engaged in constitutionally-protected speech because it involves a public figure and a matter of significant public concern.

As a result, I would conclude that respondent's conduct was constitutionally protected and cannot constitute harassment for purposes of MCL 600.411h(1)(d). Therefore, I would hold the trial court erred as a matter of law by concluding that respondent's conduct "crossed over that line in some respects" into harassing and intimidating behavior, and abused its discretion by denying respondent's motion to terminate the PPO.

/s/ James Robert Redford